**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JACINTA DOWNING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 C 05921 |
| | ) | |
| ABBOTT LABORATORIES and | ) | Judge John J. Tharp, Jr. |
| ABBOTT MOLECULAR INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jacinta Downing filed this suit against her employer, Abbott Molecular, Inc., alleging that it violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. by discriminating against her because of her race and sex and retaliating against her for voicing her complaints about that conduct. Abbott has moved for summary judgment; for her part, Downing has moved to strike portions of declarations submitted by Abbott in support of its motion. For the reasons discussed below, Downing's motion to strike is denied in large part and granted in part. Abbott's motion for summary judgment, on the other hand, is granted in small part but largely denied because the record in this case is replete with material fact disputes.[1]

---

[1] Abbott has also filed a motion to exclude Downing's proffered expert testimony on "implicit bias," which remains pending. Because the Court is denying, in large measure, Abbott's summary judgment motion, it is not necessary to resolve Abbott's motion to exclude Downing's expert testimony before issuing this opinion as to summary judgment. Even without the proffered expert testimony, Downing has adduced enough evidence to support a jury verdict in her favor as to her retaliation and race discrimination claims, and Downing's disparate impact claim, which does not survive Abbott's motion, does not rely on the proffered expert testimony.

# BACKGROUND

Jacinta Downing began working for Abbott Molecular, Inc., a subsidiary of Abbott Laboratories, in 2003.[2] Defendants' Statement of Facts ("DSOF") ¶ 3, ECF No. 212. After six years as a Molecular Area Sales Manager, Downing transitioned into the role of Regional Sales Manager in 2009, which reported directly to the Division Vice President of Americas, Mark Bridgman. As one of five regional managers, Downing supervised a team of sales representatives who were charged with selling healthcare products to hospitals, commercial laboratories, and clinics. *Id.* ¶¶ 2, 6. Between 2004 and 2012, Downing received "Achieved Expectations" or "Exceeded Expectations" in her overall annual performance ratings. Plaintiffs' Corrected Statement of Facts ("PSOF") ¶ 2, ECF No. 237.

In 2011, the company began experiencing financial distress and decided to restructure its management hierarchy in response. DSOF ¶ 8. First, Bridgman terminated one of the regional managers, a white male ("M.M."), leaving Downing (an African-American woman), C.J. (an African-American woman), M.K. (a white man), and J.G. (a white woman).[3] Then, Abbott executives added a layer of management between the regional managers and Bridgman by hiring Peter Farmakis (a white man) into a new "National Sales Director" role in October 2012. *Id.* ¶ 13. As National Sales Director, Farmakis directly supervised the regional managers; the managers no longer reported directly to Bridgman.

---

[2] Except where necessary to distinguish them, Abbott Molecular and Abbott Laboratories will be referred to collectively as "Abbott."

[3] In an effort to preserve their privacy, this opinion refers to other employees whose performance and conduct is discussed herein by their initials. These individuals are not parties to this litigation and should not be burdened by publication of details of their performance evaluations.

It is Abbott's position that Farmakis immediately noticed problems with Downing's job performance, a fact which is hotly disputed and discussed in more detail below. It is Downing's position that Farmakis was unfairly targeting her. In July 2013, Downing complained to Employee Relations about Farmakis, alleging that he was discriminating against her because of her race. PSOF ¶ 8. According to Downing, she provided several examples of Farmakis favoring M.K., the white male regional sales manager, and complained of an incident in which she and C.J. (the only black managers) were required to "pick up the slack" for the other two poorer performing white managers. *Id.* In response, Employee Relations Specialist Colleen Plettinck conducted a "climate survey" in August 2013 regarding Peter Farmakis during which she interviewed the four regional managers. DSOF ¶ 72. The results of the survey were mixed. Downing, C.J., and J.G. (the three female managers) reported that they "strongly disagreed" with the statement that Farmakis treated people in the group equally. M.K., the only male manager, reported that he felt that Farmakis did treat people equally. Pl.'s Exs. 39-42, ECF No. 213. J.G. also reported that Farmakis was "especially hard on Jay [Jacinta]" despite the fact that "her numbers [were] good." Pl.'s Ex. 42. Downing reported that, earlier in the month, Farmakis had made a comment along the lines of "did you hear about the dress code, no hoodies," which Downing perceived as racist in light of the Trayvon Martin shooting incident. PSOF ¶ 9. Abbott maintains that the survey results led Sarah Longoria, Director of Business Human Relations, to believe that Farmakis needed coaching regarding his management style but that his behavior was not discriminatory.[4] DSOF ¶ 72. The

---

[4] Longoria testified in her deposition that she raised the issue of gender discrimination with Farmakis and also asked him about the "no hoodies" comment, but that she believed Farmakis when he told her that he was not discriminating based on sex (but rather managing performances that were not meeting expectations) and that he did not intend for the hoodie comment to come across as racist. Pl.'s Ex. 9 at 129:8-17, 158:1-9.

results of the survey were eventually summarized and shared with Farmakis in late September 2013.

In October 2013, Farmakis placed both Downing and J.G. on "coaching plans" because of their alleged performance issues. *Id.* ¶ 41. According to Downing, J.G. was the lowest sales performer but had not faced any disciplinary action until this time. Shortly thereafter, J.G. took early retirement and was replaced by P.R., a white woman, at the end of 2013. *Id.* ¶ 12. Then, in January 2014, after Downing had earned the sales manager of the year award based on her sales performance, PSOF ¶ 17, Farmakis escalated Downing's coaching plan to a formal 60-day Performance Improvement Plan ("PIP") which was written and reviewed by Employee Relations Specialist Sharon Larson and Sarah Longoria. DSOF ¶¶ 44, 45. The PIP laid out various areas for improvement and expectations and explained that failure to meet those expectations would result "in a review for termination." Defs.' Ex. 40, ECF No. 167-30. Abbott does not contend that Farmakis had cause to initiate a termination review based on the PIP. On September 9, 2014, Downing filed a complaint with the EEOC alleging that Farmakis had discriminated against her because of her race by subjecting her to a hostile work environment and retaliated against her by placing her on the coaching plan and PIP. Defs.' Ex. 66, ECF No. 167-50.

At some point while this was happening, Abbott management began discussing the need for a company wide reduction in force ("RIF") to combat the ongoing sales slump. Downing maintains that discussions about a RIF began as early as October 2013; Abbott maintains they began in September 2014. DSOF ¶ 48. Regardless, Abbott executed the RIF in January 2015. Prior to doing so, Keith Chaitoff replaced Mark Bridgman as Division VP of the Americas. *Id.* ¶ 49. Although there is some dispute as to who had ultimate decision-making power with respect to the RIF, it is undisputed that Chaitoff and Sarah Longoria worked together to determine which U.S.

commercial leadership positions would be eliminated. *Id.* Ultimately, Abbott terminated 42 employees around the globe, including all four regional sales managers (Downing, C.J., M.K., and P.R.) as well as Peter Farmakis. *Id.* ¶ 52.[5]

Following the RIF, Abbott created four new positions under the title of "Regional Commercial Director." *Id.* ¶ 53. Abbott maintains that this position differed from the previous regional manager position in several ways; Downing states that the positions were materially the same. *Id.* ¶ 54. The parties also advance different descriptions of the director hiring process. Abbott states that it started its search internally, and that candidates were interviewed by a three-member panel comprised of Keith Chaitoff, Sarah Longoria, and Dave Skul (former Senior Director of Enterprise Accounts) and graded on a set of objective criteria. According to Abbott, Chaitoff was the primary decision maker and Longoria and Skul acted in an advisory capacity. *Id.* ¶ 54. Downing contends that Chaitoff and Longoria had equal responsibility and the interview process was a sham; she maintains that Chaitoff and Longoria had pre-selected the candidates they intended to hire. PSOF ¶ 25. In any case, Downing interviewed for the director position but was not hired. Instead, Abbott extended offers to P.R. (a white woman and one of the regional managers whose position had been eliminated), Paul Kuznik (a white man formerly employed by Abbott), Jim Menges (a white man employed at Abbott in a different role), and Julee MacGibbon (a white woman whose position at Abbott had been eliminated during the RIF).[6] DSOF ¶ 62. Kuznik, however, declined the offer. In March 2015, Longoria learned that Downing would not sign a severance agreement and that Abbott was at risk of being sued for discrimination. PSOF ¶ 29.

---

[5] The number of positions eliminated in the RIF net of new positions added is not clear from the record.

[6] M.K. and C.J., the other former regional managers, also interviewed for the position but were not hired.

Shortly thereafter, Abbott filled the fourth director position with E.B., an external (black male) candidate. *Id.*

Downing filed an amended complaint with the EEOC in May 2015 alleging that Abbott had retaliated against her for filing her previous EEOC charge and discriminated against her on the basis of race and sex by terminating her and failing to re-hire her. In July 2015, Downing filed suit against Abbott in this district asserting her earlier claim that Abbott retaliated and discriminated against her on the basis of race by placing her on performance improvement plans. Then, after exhausting her administrative remedies for the May 2015 EEOC charge, she amended her complaint in December 2015 to add the claim pertaining to her termination.[7] The parties subsequently engaged in more than two years of discovery, after which Abbott filed a motion for summary judgment and Downing filed a motion to strike several of the exhibits Abbott submitted in support of its motion. Even considering most of the evidence Downing seeks to strike, a jury could reasonably infer that Farmakis discriminated and retaliated against Downing by giving her negative reviews and placing her on a coaching plan and PIP, and that this proximately caused Downing's ultimate separation from the company. Accordingly, summary judgment on those claims is denied. Downing has failed to adequately establish, however, that the director hiring process had a disparate impact on African-Americans, so summary judgment as to that claim is granted.

---

[7] Downing also advanced in her amended complaint a Title VII hostile work environment theory of liability, Am. Compl. ¶ 7, and a 42 U.S.C. § 1981 race discrimination/retaliation theory of liability. *Id.* at Counts I and II. Because she does not defend (or even address) those theories in her response to Abbott's motion for summary judgment, however, the Court need not address them here. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (failure to respond to an argument results in waiver).

# DISCUSSION

## I. Plaintiff's Motion to Strike

Before turning to the merits of the summary judgment motion, the Court considers Downing's motion to strike as inadmissible portions of exhibits submitted by Abbott. *See Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017) ("Evidence offered at summary judgment must be admissible to the same extent as at trial, at least if the opposing party objects, except that testimony can be presented in the form of affidavits or transcripts of sworn testimony rather than in person.").[8] For the reasons discussed below, that motion is granted in part and denied in part.

### A. Hearsay

Downing argues that Peter Farmakis's declaration includes inadmissible hearsay. For example, Downing challenges:

- Farmakis's statement that he "received phone calls from a consultant . . . [who] lodged complaints regarding Downing's communication style, and requested that [Farmakis] instruct Downing not to call him anymore because she had an abrasive approach";

- Farmakis's statement that Downing's colleagues "expressed concern about Downing's behavior in front of customers"; and

- Farmakis's statement that one of Downing's direct reports said that "she believed Downing interfered with the strong relationships [the report] had established with customers."

Defs.' Ex. 31 Declaration of Peter Farmakis ¶ 6, ECF No. 177-1.

---

[8] Motions to strike are disfavored. *See generally Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 727 (7th Cir. 2006) (Easterbrook, J., in chambers). Their purpose is circumscribed by Fed. R. Civ. P. 12(f) (striking insufficient defenses and redundant, immaterial, impertinent or scandalous matter), but more often serve as unauthorized vehicles for parties to expand the page limits for memoranda in support of their summary judgment motions and needlessly complicate the Court's docket. If a party believes that evidence on which a party relies is inadmissible, that argument should be set forth—along with all of the party's other arguments—in the response or reply brief, not in a separate motion to strike. Nevertheless, in the interest of preventing further delay and expense to the parties, the Court has considered the motion to strike as filed and briefed.

Federal Rule of Evidence 801(c) defines hearsay as an out of court statement offered into evidence "to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c). But the out of court statements that Downing challenges—that a colleague said this or a customer said that—are not offered for their truth. In other words, Abbott does not offer Farmakis's testimony to show that Downing did in fact have an abrasive approach or behave poorly in front of customers, but rather to show that Farmakis received complaints about Downing and that the complaints affected his belief about her abilities. *See Atkinson v. SG Americas Sec., LLC*, 14 CV 9923, 2016 WL 7188163, at *7 n.2 (N.D. Ill. Dec. 12, 2016), *aff'd*, 693 Fed. Appx. 436 (7th Cir. 2017) (complaints about an employee are not hearsay when they are offered to show that an employer received complaints rather than for their truth); *see also Luckie v. Ameritech Corp.*, 389 F.3d 708, 716 (7th Cir. 2004) (complaint made to supervisor not hearsay when offered to show supervisor's state of mind at the time she was evaluating employee's performance); *Alexander v. Cit Tech. Fin. Services, Inc.*, 217 F. Supp. 2d 867, 881 (N.D. Ill. 2002) (complaint about employee admissible to show a basis for employer's belief that employee was rude with customers).[9] These statements are therefore not hearsay and need not be stricken.[10]

---

[9] The same goes for declarations of other Abbott decision-makers stating that they either received complaints about Downing directly, *see* Defs.' Ex. 39 Declaration of Dave Skul ¶¶ 4, 5, ECF No. 167-29, or that complaints were relayed to them. *See* Defs.' Ex. 41 Declaration of Keith Chaitoff ¶¶ 3, 4, ECF No. 167-31; Defs.' Ex. 33 Declaration of Sarah Longoria ¶ 5, ECF No. 167-26. That said, the Court will not consider these statements as proof of Downing's behavior.

[10] Downing also challenges the admissibility of Farmakis's notes, which are attached to his declaration and outline the complaints he says he received, on hearsay grounds. The Court need not determine whether the notes may be admitted as evidence at this juncture, however, because its ruling on Abbott's motion for summary judgment would be the same regardless of whether the Court considered the notes themselves.

## B. Personal Knowledge

Downing fares better with her challenge to Farmakis's statements that he "learned" that Downing gave one customer free training and communicated unapproved pricing to another. Critically, Farmakis does not explain ***how*** he learned those things, and that violates Federal Rule of Civil Procedure 56(c)(4)'s instruction that a declaration used to support a motion "must be made on personal knowledge." *See Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002) (witness's affidavit stating that she "learned" something about two employees did not establish personal knowledge because it did not explain how she learned of the fact in question); *see also Rabin v. Provident Life & Acc. Ins. Co.*, 98 C 1577, 2000 WL 1131944, at *7 (N.D. Ill. Aug. 9, 2000) ("In her affidavit, Rabin has not shown personal knowledge because there is no foundation for her general assertions that she 'learned' certain things.").[11]

Downing's remaining objections, however, do not suffer from the same flaw. For example, Matthew Gaulden and Brian Witajewski (who state in their declarations that Downing was their direct supervisor) testify to observing Downing's interactions with customers and traveling with

---

[11] In contrast, paragraph 2 of Farmakis's declaration (which states that it was Farmakis's "understanding" that AMD had an exclusive license for a product that held significant market share, that alternative products were becoming available, and that the competition negatively impacted AMD) does not fail for lack of personal knowledge—Farmakis established personal knowledge by stating that he joined AMD as the National Sales Director. Farmakis Declaration at ¶ 1. *See, e.g.*, *U.S. E.E.O.C. v. Humiston-Keeling, Inc.*, 54 F. Supp. 2d 798, 804 (N.D. Ill. 1999), *aff'd sub nom. E.E.O.C. v. Humiston-Keeling, Inc.*, 227 F.3d 1024 (7th Cir. 2000) (witnesses had personal knowledge of company policy by virtue of their positions as managers). This reasoning also applies to statements about Abbott's financial health made by David Skul (former Senior Director of Global Marketing and Senior Director of Enterprise Accounts), Skul Declaration at ¶¶ 6,7 and Keith Chaitoff (Vice President of the Americas), Chaitoff Declaration at ¶ 5, as well as to statements about Abbott's restructuring plan made by Sarah Longoria (Director of Business Human Resources), Longoria Declaration at ¶¶ 3, 4. *See also* 1 McCormick On Evidence § 10 (7th ed.) ("[L]ay employees of a business are often held to have enough 'personalized knowledge' of the business' operation to testify about the amount of its profits.").

her on sales calls. *See* Defs.' Ex. 32 Gaulden Declaration, ECF No. 167-25; Defs.' Ex. 59 Witajewski Declaration, ECF No. 167-45. That these witnesses do not specify the exact products about which Downing lacked knowledge, the exact dates of various customer interactions, or the exact words used by Downing in these customer interactions may go to the weight of the evidence (which is not for this Court to consider), but it does not mean that they lack personal knowledge of the events described. Similarly, the fact that neither Keith Chaitoff nor David Skul state that they personally interviewed E.B. (the individual ultimately selected for a director position post-RIF) does not suggest that they lack personal knowledge about his qualifications; indeed, their representations that they participated in the hiring process suggests the opposite. *See* Defs.' Ex. 39 Declaration of Dave Skul ¶ 10, ECF No. 167-29; Defs.' Ex. 41 Declaration of Keith Chaitoff ¶ 11, ECF No. 167-31.

### C. Contradictory Statement

Finally, Downing argues that Longoria's statement that Chaitoff was the primary decision maker in the director hiring process (and that she and Skul participated in the process solely in advisory roles) should be stricken because it contradicts her prior deposition testimony, where she stated that she and Chaitoff were "the decision-makers responsible." Pl.'s Ex. 9 Longoria Deposition 443:18-19, ECF No. 213-9. This inconsistency is not egregious, and need not be stricken from the record. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 572 (7th Cir. 2015) (explaining that an affidavit should be excluded as a "sham" to thwart summary judgment only where the witness has given clear answers to unambiguous questions in a previous deposition which negate the existence of any genuine issue of material fact). To the extent that it is relevant, however, the Court will credit Longoria's deposition testimony (which suggests that she shared equal responsibility in selecting the new directors) instead of her declaration (which downplays

her role). *See Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 809 (7th Cir. 2015) (district court may decline to consider statements in a witness's affidavit that are inconsistent with the witness's deposition testimony). This is less of an argument for striking that portion of the declaration, however, than it is for complying with the standard that already applies: courts ruling on motions for summary judgment must construe all facts in favor of the nonmoving party and take care not to weigh any conflicting evidence. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 705 (7th Cir. 2011).

Downing's motion to strike is therefore denied in large part; it is granted only with respect to Farmakis's statements that he "learned" that Downing gave one customer free training and communicated unapproved pricing to another.

## II.   Defendants' Motion for Summary Judgment

Moving on to Abbott's motion for summary judgment, the court reiterates that Downing appears to advance two primary claims: 1) that Farmakis retaliated against Downing for lodging a complaint against him and discriminated against Downing based on race by giving her negative reviews and placing her on a coaching plan/PIP and 2) that Abbott (*i.e.*, Longoria and Chaitoff) further retaliated against her and discriminated against her by terminating her and failing to re-hire her after the RIF.[12]

---

[12] Downing argues that it is improper to evaluate these employment actions separately after *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). *See* Pl.'s Resp. Br. 15, ECF No. 236. *Ortiz*, however, was concerned with the distinction (or rather, the lack thereof) between direct and indirect evidence as it is used to prove causation; it had nothing to do with lawsuits involving multiple employment actions. And because different decision makers are involved in the various adverse actions with which Downing takes issue, the Court addresses them separately. Further, Downing also advances a cursory argument in support of a disparate impact claim which the Court addresses below as well.

Summary judgment is warranted on these claims if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In this case, then, the relevant inquiry is whether the evidence, taken as a whole, would permit a reasonable jury to conclude that the challenged employment actions were motivated by Downing's race or were taken in retaliation for her complaints of discrimination. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) (applying *Ortiz* to retaliation claims).[13]

To that point, a plaintiff may prove employment discrimination simply by setting forth sufficient evidence, either direct or circumstantial, that the employer's discriminatory or retaliatory animus caused the adverse employment action, but he or she may also use the burden-shifting method established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McKinney v. Office of Sheriff of Whitley County*, 866 F.3d 803, 807 (7th Cir. 2017). Downing focuses primarily on the former method, so the Court proceeds accordingly.[14]

---

[13] For discrimination claims brought pursuant to Title VII, the plaintiff's protected characteristic need only be a "motivating factor" in the employer's decision to take the adverse employment action. 42 U.S.C. § 2000e-2(m). Retaliation claims, however, "must be proved according to traditional principles of but-for causation." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). *See also Mollet v. City of Greenfield*, 926 F.3d 894, 897 (7th Cir. 2019) (explaining that factors other than a protected activity can contribute to bringing an adverse action, but that a plaintiff must still show that the action would not have been taken had he or she not complained of unlawful discrimination).

[14] Because the parties also address the burden-shifting method, however, it is worth mentioning that under *McDonnell Douglas*, a plaintiff has the initial burden of establishing a prima facie case of discrimination (or retaliation) by showing that 1) he or she is a member of a protected class (or engaged in a statutorily protected activity), 2) he or she suffered an adverse employment action, 3) he or she met the employer's legitimate job expectations, and 4) similarly situated employees outside the protected class (or who did not engage in protected activity) were treated more favorably. The burden then shifts to the employer to articulate a non-discriminatory reason

### A. Performance Management

#### 1. Retaliation

Downing first claims that Farmakis placed her on a coaching plan and a PIP in retaliation for complaining about unlawful discrimination to Employee Relations. To succeed on a retaliation claim, a plaintiff must prove "(1) that she engaged in statutorily protected activity; (2) that her employer took an adverse employment action against her; and (3) that the protected activity and the adverse employment action are causally connected" *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016). There is no dispute that Downing engaged in a statutorily protected activity when she complained to Employee Relations that Farmakis was discriminating against her, nor is there a dispute that the measures taken constituted adverse employment actions.[15] The only issue, then, is whether the evidence is sufficient to permit a reasonable jury to conclude that the actions complained of (here, institution of the coaching plan and escalation of that plan to a formal PIP) would not have been taken but for Downing's complaints about Farmakis. Evidence of causation may include factors like "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse

---

for the action, and once that showing is made, the plaintiff must show that the reason given was pretext. *McKinney v. Office of Sheriff of Whitley County*, 866 F.3d 803, 807 (7th Cir. 2017); *see also Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801 n.3 (7th Cir. 2018) (describing framework in terms of retaliation). Only the third and fourth element of the prima facie case and the pretext analysis are at issue here, and would involve an analysis of the same evidence discussed under Downing's more holistic approach.

[15] In contrast to discrimination claims, where an action is typically considered materially adverse only if it results in a change in the terms or conditions of the plaintiff's employment, *Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 470 (7th Cir. 2018), an action is "materially adverse" for purposes of retaliation if it would dissuade a reasonable employee from engaging in the protected activity. *Koty v. DuPage County, Illinois*, 900 F.3d 515, 520 (7th Cir. 2018).

employment action." *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018).

As an initial matter, factual disputes abound with respect to whether, as Abbott maintains, Downing had a history of significant performance problems.[16] And contrary to Abbott's assertions, the dispute goes beyond whether Downing was in fact performing poorly; Downing also adequately challenges whether Farmakis honestly believed that disciplinary action was warranted. *See McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009) ("The pretext analysis focuses on whether the reason was honest and not whether it was accurate or wise.").

For example, Abbott states that customers called Farmakis directly to report problems with Downing's performance and to request that she no longer work on their accounts. *See* DSOF ¶¶ 18, 19. But Abbott's evidence of those calls consists largely of Farmakis's own declaration and notes, and Downing points to evidence that is inconsistent with Farmakis's statements, noting that not only did Farmakis not remove her from the accounts in question (Pl.'s Ex. 2 ¶ 46, ECF No. 213-2), he advised customers who were allegedly complaining about Downing that Downing would be working closely with them going forward (Pl.'s Ex. 177-C, ECF No. 237-13, Aug. 2013 email; "Jay will provide more details/introduction[s] in the weeks ahead") and praised her performance with respect to those customers. *See* Pl.'s Ex. 176-A, ECF No. 237-12 (January 2013 e-mail from Farmakis to Downing expressing that she did a "very nice job on the call today" and that Farmakis "was impressed.").

---

[16] Under the *McDonnell Douglas* method, this analysis coincides with Downing's prima facie burden of establishing that she met Abbott's legitimate expectations. Further, because Abbott's purported reason for giving Downing negative employment reviews is, unsurprisingly, that Downing was not meeting expectations, the prima facie analysis merges with the pretext analysis and the question becomes simply whether the employer is lying. *See Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dept.*, 510 F.3d 681, 687 (7th Cir. 2007).

The only evidence in the record originating from a customer is an e-mail from ViraCor CFO Matt Urbanek dated January 2014 (*i.e.*, after Downing was given the formal coaching memo). *See* Defs.' Ex. 15, ECF No. 167-11. Downing does not dispute that this customer requested to work with someone else, but Downing maintains that it was Farmakis who made her look bad— apparently, Downing had (prior to Farmakis's arrival) forgiven a debt owed by ViraCor in light of mitigating circumstances and Farmakis had made her go back on her word after assessing finances at the end of the year. Defendants' Response to PSOF ¶ 38.5, ECF No. 240-2. And contrary to Abbott's position, there is evidence in the record apart from Downing's own declaration suggesting that forgiving this debt was within her discretion. *See, e.g.*, Pl.'s Corrected Ex. 175-A, ECF No. 237-11 (e-mail from Contracts & Pricing asking Downing "what she would like to do" with respect to ViraCor); Pl.'s Corrected Ex. 175-E (e-mail from Farmakis to Downing asking for specifics and "suggesting" that they bill the customer, but not stating that the debt forgiveness was unauthorized).

Similarly, Abbott maintains that numerous employees expressed concern with Downing's management style, demeanor in front of customers, and general understanding of Abbott products, but Downing has produced evidence to the contrary. *See, e.g.*, Pl.'s Ex. 5 ¶ 7, ECF No. 213-5 (declaration of Michael Cerney, who reported to Downing, stating that Downing was "professional, responsive and supportive of [him] generally and when [they] were in front of customers or prospective customers"); Defs.' Ex. 9 at 055507, ECF No. 167-8 (Farmakis's 2012 review of Downing, authored in February 2013, stating that she "knows the Molecular products and the laboratories" and rating her as "Achieves Expectations" in the "Know the Business"

section of the review).[17] And other evidence offered by Downing supports an inference that clients

who were allegedly disgruntled with Downing were in fact unhappy with Abbott's pricing. *See,*

*e.g.*, Pl.'s Ex. 177-A, ECF No. 237-13 ("Jay and I have had many discussions in the past regarding

UroVysion [an Abbott product] and almost everything boils down to price."); Pl.'s Ex. 181, Aug.

23, 2012 email (email noting customer perception that "Abbott is a BULLY" with respect to

pricing, among other contract terms). To be sure, the declaration of Downing's direct report Bryan

Witajewski stating that he raised issues about Downing to Farmakis, Defs.' Ex. 59, and a March

2013 e-mail to Farmakis from the head of training describing Downing as providing feedback to

employees who reported to her in "a condescending, demotivating manner," Defs.' Ex. 22, ECF

No. 172-8, corroborate Abbott's position that Farmakis honestly believed that Downing was

having problems. But Downing has produced competing evidence from which one could question

the truthfulness of Witajewski's declaration,[18] and the e-mail from the head of training also stated

---

[17] Abbott cites to *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 752 n.6 (7th Cir. 2006) for the proposition that a co-worker's general compliments are insufficient to establish that a plaintiff was meeting the employer's legitimate expectations. But *Burks* also explained that there may be a triable issue where a co-worker corroborates that specific events which formed the basis for the employee's termination did not occur. *Id.* Cerney's declaration not only offers "general averments of adequate performance," it also disputes a specific fact cited by Abbott. *Compare* Defs.' Ex. 31, Farmakis Declaration ¶ 9(c) (Farmakis testifying that Downing improperly communicated to Cerney that she would try to get him into a higher pay grade) *with* Pl.'s Ex 5 (testimony from Cerney stating that the incident never happened).

[18] For example, Witajewkis's declaration suggests that a customer did not renew its contract because of aggressive tactics displayed by Downing in a meeting. Defs.' Ex. 59 ¶ 4(c). But an e-mail Witajewski sent recapping what had happened with that customer suggests that the customer had actually "had one foot out the door" for some time due to concerns regarding price and that Downing had "talked [the customer] off the ledge." Pl.'s Corrected Ex. 181-B, ECF No. 237-14. Further, when Witajewski was later reassigned to a different manager, he wrote to Downing stating that he was disappointed to no longer be on her team and thanking her for her guidance and direction. Pl.'s Corrected Ex. 181-I. *See Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (explaining that a plaintiff can defeat summary judgment by providing specific evidence in support of an attack on a witness's credibility).

that the managers had not yet received training in "situational leadership"—in other words, accepting part of the blame for the problem as due to a lack of training by the company.

Further, while Abbott argues that Downing had difficulty hitting her sales forecasts, it is undisputed that Downing received the "regional sales manager of the year" sales bonus in 2013—a fact that Abbott seeks to dismiss as being based solely on sales numbers rather than on an overall assessment of the manager's performance—and routinely received positive performance reviews prior to Farmakis's arrival. Defendants' Response to PSOF ¶¶ 2.1, 17.5, ECF No. 240-2.

The parties devote substantial portions of their briefs and statements of facts to these and other examples of conduct characterized by Downing as discriminatory and by Abbott as evidence of poor performance. It is not necessary to catalog them all here; many, if not all, require a jury's evaluation and those set forth above are sufficient to demonstrate the point. It is difficult to reconcile this conflicting evidence, but looking at the evidence as a whole, there is enough grist for the factfinder's mill to support a conclusion that Downing was meeting Abbott's expectations.[19]

Even construing all the factual disputes in Downing's favor, however, evidence that Farmakis placed Downing on a coaching memo and performance improvement plan when he did not believe that there were problems with her performance does not by itself establish that he acted

---

[19] For that reason, Abbott's reliance on this Court's decisions *in Jones v. J.B. Hunt Transp., Inc.*, 15-CV-07450, 2017 WL 3130645, at *5 (N.D. Ill. July 24, 2017), where the plaintiff did not dispute her record of performance issues, *Hopkins v. Bd. of Educ. of City of Chicago*, 73 F. Supp. 3d 974, 980 (N.D. Ill. 2014), where a teacher did not dispute that her employer received parental complaints, and *Robinson v. Colvin*, 13 C 2006, 2016 WL 1161272, at *2 (N.D. Ill. Mar. 24, 2016), where the plaintiff did not dispute that complaints about him were made, is misplaced. *See also Nehan v. Tootsie Roll Indus., Inc.*, 54 F. Supp. 3d 957, 970–72 (N.D. Ill. 2014) (employee admitted that he refused to work overtime, which was stated reason for his termination), *aff'd* 621 Fed. App'x 847 (7th Cir. 2015); *Sheppard v. Vill. of Glendale Heights*, 2014 WL 1227025, at *5 (N.D. Ill. Mar. 25, 2014) (employee admitted to committing multiple infractions).

with retaliatory or discriminatory animus. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) ("It is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.") (internal citations omitted); *see also*, *e.g.*, *Hobbs v. City of Chicago*, 573 F.3d 454, 461-62 (7th Cir. 2009) (district court did not err by requiring plaintiff to show both pretext and discriminatory animus; "a plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent"). It is therefore necessary to address the other types of evidence presented by the parties.

First, Downing argues that the timing of the disciplinary actions was suspicious. It is undisputed that Downing complained to Employee Relations that Farmakis was discriminating against her because of her race on July 19, 2013. PSOF ¶ 8. It is also undisputed that in response to that complaint, Employee Relations conducted a "climate survey" in August 2013 during which Employee Relations specialist Colleen Plettinck interviewed the four regional managers to gather information about Farmakis and their work environment. *Id.* ¶ 9. On Thursday, September 26, 2013 Plettinck shared the results of the survey with Mark Bridgman and Sarah Longoria. *Id.* ¶ 10. Shortly thereafter, Bridgman and Longoria met with Farmakis to discuss the results of the survey and specifically the fact that people on his team believed that he treated them differently due to gender.[20] *See* Pl.'s Ex. 9, Longoria Deposition at 158:3 (explaining that Longoria could not remember the exact date she met with Farmakis about the survey, but that she would have wanted to have the meeting "as soon as possible"). On October 3, 2013 Farmakis e-mailed Longoria

---

[20] It is unclear from the record what specific information Bridgman and Longoria shared with Farmakis, but based on Longoria's statement that they discussed the issue of differential treatment based on gender it would not have been difficult for Farmakis to surmise that the negative reviews came from Downing, C.J., and J.G.

expressing his intent to cite Downing, J.G., and C.J. for insubordination arising out of an event that had occurred more than two months prior where, according to Farmakis, he had asked all four managers to provide him with a document outlining a plan for how to achieve their respective sales goals but only M.K. had complied. Pl.'s Ex. 49, ECF No. 213-49.[21] A few days later, both Downing and J.G. were placed on formal coaching plans. PSOF ¶ 13.

Abbott argues that Farmakis's efforts to manage Downing's performance began well before the climate survey was conducted and therefore could not be retaliatory. Indeed, it is undisputed that Farmakis discussed with Employee Relations the possibility of placing Downing on a formal coaching memo as early as March of 2013. *See* Pl.'s Ex. 32 at 2320, ECF No. 213-32. On the other hand, Farmakis's Employee Relations service ticket regarding Downing was formally closed in early June 2013 when Farmakis did not respond to an e-mail asking if he needed further guidance managing Downing's performance. *Id.* Farmakis, moreover, stated in May 2013 that Downing was "doing everything he [was] asking and making improvements" and that he had not received any recent complaints about her performance. Pl.'s Ex. 32, ECF No. 213-32. Further, the fact that Farmakis had previous issues with Downing does not explain why he would suddenly want to write up J.G. and C.J. for insubordination and place J.G. on a coaching plan; Abbott has offered no evidence to explain the timing of that conduct. The timeline of events could, therefore, provide reasonable cause for a jury to suspect Farmakis's motives.

Downing also points to the fact that M.K., the only regional sales manager who did ***not*** rate Farmakis negatively during the climate survey, received positive evaluations from Farmakis

---

[21] According to Downing (and corroborated by a July 2013 e-mail from C.J. to Farmakis), C.J. and Downing did not comply with Farmakis's directive because Farmakis had set their sales targets unreasonably high in order to make up for the other managers' shortcomings. C.J. and Downing felt this was unfair and refused to commit to numbers that they did not think would be possible to achieve. Defs.' Ex. 23, ECF No. 167-17.

in his 2013 annual review, *see* Defs.' Ex. 74, ECF No. 167-56, despite the fact that he lagged in

sales behind Downing and C.J., *see* Pl.'s Ex. 56, ECF No. 213-56, and had received complaints

about his management style from his direct reports. *See* PSOF ¶ 30 (undisputed that a former

employee had sued M.K. for gender discrimination);[22] *see also* Pl.'s Ex. 138, ECF No. 123-138

(Farmakis describing M.K. as "not high talent."). Abbott responds by arguing that M.K. is not

"similarly situated" to Downing because he did not engage in similar conduct. First, as discussed

above, there is a dispute as to whether and to what extent Downing engaged in problematic

conduct. Regardless, though, "the similarly-situated inquiry is flexible, common-sense, and

factual." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). The fact that M.K. held the

same job as Downing and reported to the same supervisor suggests that there are "enough common

features between the individuals to allow a meaningful comparison." *Id.* That is particularly true

in light of the fact that M.K. apparently performed worse than Downing on objective criteria and

was the subject of employee complaints regarding his management style (one of the major

problems Abbott maintains it had with Downing) yet unlike Downing was not given negative

performance reviews or placed on a PIP.

  While a jury could certainly resolve these fact disputes in Abbott's favor, in assessing this

motion the Court is required to draw all reasonable inferences in Downing's. In doing so, the Court

concludes that a reasonable jury could conclude that in putting Downing on performance

management plans, Farmakis (and therefore Abbott) was retaliating against Downing for

complaining that Farmakis was discriminating against her. The fact that the initial service ticket

---

[22] *See also* Pl.'s Ex. 120, ECF No. 213-120 (report from Employee Relations outlining that that M.K.'s direct reports described him as "managing with a strong thumb" and "very difficult" and explaining that that he "loses it and gets angry" when something isn't done and that his demands are "out of control," among other things).

Farmakis opened with Employee Relations had been closed for almost three months before the climate survey occurred plus the fact that Farmakis ramped up his efforts to "manage" Downing's performance immediately after learning the results of that survey suggests that Farmakis escalated his discipline of Downing in retaliation for her complaints. That inference is bolstered by the fact that M.K., the only non-complaining manager, did not receive similarly negative performance reviews and the fact that Farmakis expressed his desire to write up C.J. and J.G., who did complain, shortly thereafter. Accordingly, the Court concludes that Downing has adduced enough evidence to support a jury verdict in her favor on her claim that Farmakis retaliated against her for complaining about discrimination by giving her negative performance evaluations and placing her on performance management plans.

### 2. Discrimination

Downing also argues that Farmakis gave her negative reviews and placed her on performance management plans as a form of race-based discrimination.[23] In addition to the "pretext" evidence discussed above regarding Downing's job performance, Downing supports her discrimination claim by arguing that Farmakis 1) started recording false performance issues only after he met her in person and discovered her race; 2) targeted the two black managers while

---

[23] Downing's performance management claim can be based only on race discrimination, not gender discrimination, as only race based discrimination was mentioned in the initial EEOC charge. Defs.' Ex. 66, ECF No. 167-50. *See Moore v. Vital Products, Inc.*, 641 F.3d 253, 256 (7th Cir. 2011) (claims not included in EEOC charge may not be brought in subsequent Title VII judicial proceeding unless they are reasonably related to the allegations in the EEOC charge); *see also Fairchild v. Forma Sci., Inc.*, 147 F.3d 567, 574 (7th Cir. 1998) (disability discrimination theory of liability not related to age discrimination theory of liability). *Cf. Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (sex discrimination claim allowed to proceed because while plaintiff checked only "race discrimination" in her EEOC charge, she included gender-based allegations). In contrast to the *Jenkins* plaintiff, Downing did not include any gender-based allegations in her initial EEOC charge.

praising the white male manager; and 3) made a comment to her about a "no hoodie" dress code in the wake of the Trayvon Martin shooting incident.[24]

Downing's assertion that Farmakis started manufacturing performance issues only after he met her in person is without support in the record. According to Downing, Farmakis expressed his intent to give Downing an "Achieves Expectations" performance review on November 29, 2012, but, after discovering her race in early December 2012, began to compile a list of issues with her performance. Pl.'s Corrected Resp. Br. 3, ECF No. 236. Downing's only evidence of the timing of their first in person meeting comes from her declaration in which she states that, "to the best of [her] recollection," she did not meet Farmakis until December 3, 2012. Pl.'s Ex. 2 ¶ 16, ECF No. 213-2. But this is contradicted by an e-mail Farmakis sent on November 2, 2012 stating that he had his first face-to-face meeting with the regional sales managers the week before. Defs.' Ex. 99, ECF No. 240-29. As the Seventh Circuit has noted, "inconclusive" testimony cannot by itself create a genuine factual dispute. *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011); *see also Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002) (plaintiff's statement that she did not recall receiving a brochure did not raise a genuine issue of material fact where uncontroverted affidavit of a different witness indicated that brochure was definitely sent).

The evidence regarding differential treatment is more ambiguous. On one hand, it is undisputed that Farmakis placed both Downing and J.G. (the white female manager) on PIPs. That might suggest that Farmakis was not motivated by race, particularly in light of the fact that C.J., the only other black manager, was not placed on any sort of coaching plan. While a defendant cannot succeed on summary judgment merely by identifying an employee within the protected

---

[24] Abbott does not dispute that the negative reviews, coaching plan, and PIP constituted adverse employment actions, perhaps because Downing has set forth evidence suggesting that these actions resulted in monetary loss in the form of reduced stock awards. *See* PSOF ¶ 20.

class who was treated favorably, *see Diaz v. Kraft Foods Glob., Inc.*, 653 F.3d 582, 588 (7th Cir. 2011), these facts do tend to rebut Downing's position.

On the other hand, Downing has produced evidence of more subtle differential treatment. For example, as noted above, Farmakis set sales goals in July 2013 that arguably penalized C.J. and Downing for performing well by requiring them to reach unattainable targets while lowering the overall sales targets for the two white managers. *See* Pl.'s Ex. 36, ECF No. 213-36 (e-mail from Farmakis suggesting that all managers would be required to achieve $1.25MM above their Last Best Estimates regardless of net effect on original sales plan). Further, Downing points to evidence suggesting that when Farmakis realigned the sales regions in early 2014, Downing and C.J. were given the least profitable territories, Pl.'s Ex. 65 ECF No. 213-65, and it is undisputed that all of the African-American sales representatives were assigned or reassigned to their teams.[25] What's more, evidence in the record suggests that Farmakis caused C.J. and Downing to receive reduced bonus amounts based on their "performance issues," *see* Pl.'s Exs. 81, 82, and 83, while making no reductions for the two white managers (at that point, M.K. and P.R.).[26] That is seemingly at odds with Abbott's repeated assertion that Farmakis referred to C.J. as "the best on

---

[25] Abbott maintains that the sales territories were balanced in their potential for sales opportunities, but Plaintiff's Exhibit 65, which sets out the "indexes" for each territories, suggests that they were not. There is therefore a genuine dispute with respect to that fact which must be resolved in Downing's favor for purposes of this motion. The same goes for Abbott's contention that the realignment was designed by an independent consultant rather than Farmakis, *see* Defendants' Response to PSOF ¶ 15, given the fact that the spreadsheet outlining the plan stated that "Peter" was in charge of "Finaliz[ing] Alignments," Defs.' Ex. 18 at 057459, ECF No. 167-14, and Abbott's evidence suggests only that Farmakis "worked with" the consulting firm on the realignment, not that Farmakis was not ultimately responsible. *Id.* at 057452.

[26] Abbott notes that C.J. received a higher bonus than any of the other managers. That may be so, but the point Downing is making is not about raw amounts, but about individual reductions from previous years.

the team," s*ee* Defs.' Reply Br. 12, ECF No. 240, and is therefore probative of discriminatory intent.

Further, a factfinder could reasonably infer that Farmakis's August 2013 comment about a "no hoodie" dress code (directed toward Downing and made while laughing) was racially charged considering the widely publicized shooting of Trayvon Martin, an African American teenager who was wearing a hoodie at the time of his death. *See* Fed. R. Evid. 201(b) (A district court may take judicial notice of a fact that is not subject to reasonable dispute because it "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").[27] Abbott argues that this was merely a "stray remark" insufficient to establish discriminatory animus because it was not made in reference to an employment decision. Defs.' Opening Br. at 18. But the remark was made only a couple of months before Farmakis placed Downing on a coaching plan and need not be considered in isolation. *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) (isolated comment unrelated to employment decision insufficient to support inference of discriminatory animus ***when standing alone***).

Finally, Downing notes in her brief that Farmakis's tenure coincided with a dramatic decrease in black representation at Abbott Molecular from 32 black employees in 2012 to 16 in

---

[27] Abbott's suggestion that the "hoodie" comment could not be interpreted as race related because it was made 15 months after Trayvon Martin was killed is unpersuasive. Defs.' Resp. to PSOF ¶ 9. Indeed, according to Abbott's own source, a jury found the shooter not guilty on July 13, 2013, only a couple of weeks before the comment was made. *See* CNN, TRAYVON MARTIN SHOOTING FAST FACTS, https://www.cnn.com/2013/06/05/us/trayvon-martin-shooting-fast-facts/index.html. And even absent any temporal connection to the Travon Martin shooting, it would be understandable for a factfinder to draw the inference that the comment reflected racial animus in view of the lack of any other credible explanations for announcing to an African-American coworker that the company dress policy does not permit the wearing of an article of clothing often associated with stereotypes of African-American males.

2015. *See* Pl.'s Ex. 126, ECF No. 213-126. Abbott's only response to this data is that it is unrepresentative of the company as a whole. *See* Defs.' Resp. to PSOF ¶ 36. But that Downing's data presumably reflects only the employees at the location in which Farmakis was employed would seem to make it more, not less, relevant. Correlation, of course, is not causation, *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988), but the decrease is nevertheless consistent with Downing's narrative and other evidence and, at a minimum, rules out any argument by Abbott that an inference of discrimination is unwarranted by reference to evidence that it was enhancing racial diversity within the division.

The individual pieces of evidence offered in support of Downing's claim that Farmakis targeted her with disciplinary action because of her race are by no means overwhelming, but a number of weak observations taken as a whole may support an inference of discrimination. *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). Here, Downing has presented evidence that Farmakis treated the black managers less favorably than the white managers, made at least one racially charged comment, and relied on pretextual reasons for implementing performance management measures with respect to Downing. That combination of circumstances is sufficient to permit a jury to find that race was a motivating factor behind the coaching plan and PIP.

## B.  RIF & Director Hiring

Downing next challenges her termination and Abbott's failure to re-hire her on grounds of discrimination and retaliation. In support, Downing relies heavily on the evidence discussed above regarding Farmakis's motivations for managing her performance. But it is undisputed that Farmakis was not in charge of designing the RIF or hiring directors—to the contrary, Abbott terminated him in the RIF as well. Accordingly, the relevant question is whether the actual decision

makers—Chaitoff and Longoria, according to Downing—harbored discriminatory or retaliatory animus toward her.[28] *See Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011) (Title VII plaintiff must show that *decisionmaker* acted for a prohibited reason). As to Chaitoff, Downing has not offered any evidence suggesting that he acted with a discriminatory or retaliatory motive. Indeed, Downing argues that "Abbott" decided to remove her from the company *before* Chaitoff took over for Bridgman in June 2014. Pl.'s Resp. Br. at 11.

As to Longoria, the evidence set forth by Downing is sparse.[29] Downing does argue, however, that "Longoria believed all the accusations Farmakis had made against Downing" regarding her performance as a manager, Pl.'s Resp. Br. at 37-38, and, as Downing notes in her response brief (*id.* at 33), a plaintiff may succeed on an employment discrimination claim against an unbiased decision maker "when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015); *see also Miller v. Polaris Laboratories*, LLC, 797 F.3d 486, 492 (7th Cir. 2015) (applying theory to retaliation claim). To survive summary judgment on such a theory, often referred to as "cat's paw" liability, a plaintiff must provide evidence that 1) the biased subordinate actually harbored discriminatory animus against the victim of the employment action and 2) the biased subordinate's scheme was the

---

[28] As previously noted, there is some dispute as to Longoria's level of involvement in these employment actions, but a jury could reasonably infer that she and Chaitoff had equal decision-making power. *See, e.g.*, Pl.'s Ex. 9 Longoria Deposition at 443:18 (Longoria stating that she and Chaitoff were the decision-makers responsible).

[29] For example, Downing states that Longoria "accepted Farmakis's denial without investigating the accusations made in the climate survey," PSOF ¶ 10, "failed to express concern" about the nature and timing of Farmakis's zeal to discipline complaining employees, Pl.'s Resp. Br. 7, ECF No. 236, and "assisted" Farmakis in his efforts to discipline Downing by providing comments on Farmakis's coaching plan, PSOF ¶ 13. This may point to negligence in the form of misplaced trust in, and reliance on, Farmakis, but is not, without more, indicative of intentional discrimination.

proximate cause of the adverse employment action. *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017). Notably, the subordinate need not be the "singular influence" in the employment decision. *Wood*, 803 F.3d at 869.

In this case, as described above, a reasonable jury could find that Farmakis harbored retaliatory and discriminatory animus toward Downing and sought to have her removed from the company. Focusing on the second inquiry, then, the Court concludes that a reasonable jury could also find that Farmakis's animus was the proximate cause of Downing's termination. Most significantly, Longoria testified that she believed everything that Farmakis told her about Downing.[30] Pl's Ex. 9 at 345:9.

There is also reason to doubt Abbott's argument that the elimination of manager positions and the director hiring process were unrelated to Downing. First, it is undisputed that Longoria created a document in December 2013 which included a slide labeled "next steps" and a bullet point stating, "complete management changes in US sales (Downing, [C.J.])," PSOF ¶ 16, notwithstanding that Downing had been first among the managers in sales that year. While not conclusive, one could reasonably infer, in light of the accusations about Downing's performance leveled by Farmakis and the fact that Longoria knew about and assisted Farmakis with Downing's coaching plan, that "management change" meant that Longoria planned to eliminate Downing (and C.J., the only other black regional sales manager[31]) from the company.

---

[30] Abbott notes that Longoria also testified that outside information about Downing "wasn't just coming from Farmakis." Defs.' Reply Br. at 15 n.10. This does not suggest, however, that Longoria conducted the sort of meaningful independent investigation into Downing's performance that would break the causal chain. *See Woods*, 803 F.3d at 870 (employer may not be subject to liability if ultimate decision-maker determines that adverse action is justified ***apart from biased subordinate's influence***).

[31] Abbott offers a credible argument that the slide does not suggest an intent to terminate Downing and C.J., but that only serves to underscore the point that it is the province of a jury to assess the credibility of the competing spins on the facts that have been developed and that at this

Second, Downing offers evidence suggesting that the stated reason for eliminating the manager positions—cost savings—is dishonest. Specifically, unlike any of the other eliminated positions, the four "manager" positions were replaced by four ***higher paid*** "director" positions with similar responsibilities, and P.R., one of the former managers, was given one of the spots. Pl.'s Resp. Br. at 32. Abbott responds by stating that the directors were required to 1) "absorb" the National Sales Director position and the Senior Director of Enterprise Accounts position (which were also eliminated in the RIF), 2) report directly to the division Vice President, and 3) take on profit and loss responsibility, which accounted for the higher salary. Defs.' Opening Br. at 22. But Downing has produced evidence showing that the division VP, not the directors, absorbed the National Sales Director position. *See* Pl.'s Ex. 172, ECF No. 213-172 (e-mail from Chaitoff stating that he would "play that role"). It seems doubtful, moreover, that the Senior Director of Enterprise Accounts position, held by Dave Skul, was truly eliminated; Skul was not included on the list of employees impacted by the RIF, Defs.' Ex. 45, ECF No. 167-35, and the post-RIF organizational charts show a position called "Sr. Director, Enterprise Solutions" held by Skul. Defs.' Ex. 47, ECF No. 172-14. Further, it is undisputed that before Farmakis was hired, there was no "National Sales Director" position and the regional managers reported directly to the division Vice President; the fact that the new directors would also report directly to the VP, then, does not persuade the Court that the director position can be reasonably viewed only as materially different from the manager position. And Downing testified that as a manager, she had always been responsible for profit and loss in her region. Pl.'s Ex. 2 ¶ 5.

---

stage, as the non-movant, it must be assumed that the jury would resolve such arguments in Downing's favor.

Finally, Abbott argues that it would be "ridiculous" to infer that Abbott would terminate multiple other employees to cover up terminating Downing. But that misses the point—"[t]he relevant decision here relates not to the reduction-in-force itself, but to the alleged decision to eliminate [the manager] position." *Janiuk v. TCG/Trump Co.*, 157 F.3d 504, 509 n.5 (7th Cir. 1998). It's true that all four managers technically lost their jobs, but P.R. was hired as one of the directors, meaning that Abbott would only have had to fire C.J. and M.K. as "collateral damage." This is not so difficult to believe—M.K. was not "high talent" and had problems in the past, and there is evidence in the record suggesting that Farmakis had targeted C.J. as well as Downing.

As for Downing's failure to hire claim, the record indicates that Longoria relied on Farmakis's reports when evaluating Downing during her interview for the director position.[32] Pl's Ex. 9 at 345:9; *see also id.* at 401:6 ("Based on the feedback that we received, we did not believe she was an inspirational leader."). And contrary to Abbott's argument (Opening Br. at 2-3), Downing is not **required** to show that her credentials were so superior to those of the successful candidates that "no reasonable person could have impartially chosen [them] over [her]," *Victor v. Vill. of Hoffman Estates*, 13 C 00921, 2016 WL 232420, at *12 (N.D. Ill. Jan. 20, 2016), to succeed on a cat's paw theory of liability. That is the standard only where a plaintiff attempts to use disparate qualifications as evidence of pretext, *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002), which Downing does not do. In other words, Downing does not argue (at least for purposes of this theory) that Longoria did not honestly believe that the other applicants were more

---

[32] It bears noting that although Farmakis reported in February 2014, midway through the PIP, that Downing's performance still did not meet requirements (though acknowledging that it had improved), Abbott has adduced virtually no evidence of substandard performance by Downing over the balance of 2014. Farmakis did not initiate a termination review and, whether the PIP was justified or not, the evidence does not provide a basis to conclude that Downing was not meeting expectations when, in September 2014, Abbott says it began consideration of the RIF or thereafter when it was assessing candidates for the new Director positions.

qualified; instead, she argues that she was not given a fair shot because the process was infected by Farmakis's discriminatory and retaliatory animus. *See Alexander v. City of Milwaukee*, 474 F.3d 437, 449 (7th Cir. 2007) (plaintiffs may receive damages where what they lost was a chance to compete on fair footing, not the promotion itself). Because a reasonable jury could conclude that Farmakis's impermissible motivations proximately caused the adverse employment actions, summary judgment must be denied.

### C.     Disparate Impact

The third theory advanced by Downing is that the director hiring process (specifically a purported point system used to rate applicants on a set of criteria), had a disparate impact on African Americans. Abbott first argues that Downing failed to identify this policy in her EEOC charge. But Downing asserted a disparate impact claim with respect to her "termination and thereafter" and the reduction in force, Defs.' Ex. 67, and Abbott provides no legal support for its position that this is insufficient. Further, in response to Abbott's interrogatory requesting that Downing identify the practices forming the basis of her disparate impact claim, Downing pointed to "the creation and filling of vacant positions . . . after reductions in force." Defs.' Ex. 16 ¶ 15, ECF No. 167-12. This is therefore unlike the situation in *Bennett v. Roberts*, 295 F.3d 687, 698 (7th Cir. 2002), where the plaintiff made no reference at all, prior to summary judgment, to the policies she challenged.

Downing's disparate impact claim nevertheless falls short. Under Title VII's disparate impact provision, a plaintiff establishes a prima facie violation by showing that an employer uses a particular employment practice that (needlessly, though not necessarily intentionally) causes a disparate impact on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(k)(1)(A)(i); *Richardson v. Rush Presbyterian St. Luke's Med. Ctr.*, 63 Fed. Appx. 886, 889 (7th

Cir. 2003). To do so, plaintiffs must provide statistical evidence "of a kind and degree sufficient to show that the practice in question" caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. *Watson*, 487 U.S. 977 at 994. Downing does not meet this burden. While it is undisputed that out of the ten applicants who were initially interviewed for the position, C.J. and Downing (the only two African American applicants) received the lowest ratings, *see* Defs.' Ex. 50 ECF No. 167-37,[33] a sample size of 10 individuals is simply too small to be statistically meaningful. *See Parker v. Fed. Nat. Mortg. Ass'n*, 741 F.2d 975, 980 (7th Cir. 1984) (sample size of 12 lacked "sufficient breadth to be trustworthy"); *Soria v. Ozinga Bros., Inc.*, 704 F.2d 990, 995 (7th Cir. 1983) (sample size of fifteen drivers too small); *White v. Office of Cook County Pub. Def.*, 14-CV-7215, 2017 WL 3493803, at *8 (N.D. Ill. Aug. 14, 2017) (collecting cases). Abbott's motion for summary judgment is therefore granted with respect to that claim.

*     *     *

For the reasons set forth above, Abbott's motion for summary judgment is denied in part and granted in part. Downing has produced sufficient evidence to support a jury verdict on her

---

[33] As an aside, Abbott quibbles with Downing's failure to include the scores of two African American candidates interviewed after one of the white candidates rejected an offer, but Longoria herself testified that they did not document those interviews or record any numerical ratings, *see* Pl.'s Ex. 9 Longoria Deposition 371:23-24, and there is sufficient evidence in the record from which a jury could infer that Abbott interviewed and ultimately hired an external African American candidate because it became aware that Downing was likely to sue for discrimination. *See, e.g, id.* at 359:9-23 (suggesting that after learning that Downing would not sign severance agreement, Longoria told talent management that candidates had to be diverse); *see also* Pl.'s Ex 117 (e-mail from Longoria to Chaitoff after hiring African American candidate stating that she felt "very good" about potential legal challenges and thanking him for "being so conscious of that aspect."). Even if Abbott hired E.B. in an effort to insulate itself from liability, however, the hiring decision does lessen the overall allegedly disparate impact Downing challenges and cannot be entirely discounted.

individual disparate treatment claims alleging that Farmakis discriminated and retaliated against her and that his animus caused her separation from the company. She has failed, however, to meet that burden for her disparate impact claim.


Date: September 5, 2019

John J. Tharp, Jr.
United States District Judge