**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JACINTA DOWNING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge John J. Tharp |
| v. | ) | Case No. 15-cv-05921 |
| | ) | |
| ABBOTT LABORATORIES and ABBOTT | ) | |
| MOLECULAR INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ABBOTT'S MOTION FOR JUDGMENT AS A MATTER OF LAW**
**AND MEMORANDUM IN SUPPORT**

Dated: August 22, 2021

James F. Hurst
Christa C. Cottrell
Rebecca Fitzpatrick
Taj Clayton
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000
james.hurst@kirkland.com
ccottrell@kirkland.com
rebecca.fitzpatrick@kirkland.com
taj.clayton@kirkland.com

*Counsel for Abbott Laboratories and Abbott Molecular Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Legal Standard ................................................................................................................ 1

Argument ......................................................................................................................... 2

I.      **Ms. Downing's Claim for Punitive Damages Should Be Dismissed as a Matter of Law** ................................................................................................................. 2

II.    **There is No Evidence that the Coaching Plan and Territory Realignment Were Materially Adverse Acts.** ............................................................................ 5

III.  **Downing Failed to Present Legally Sufficient Evidence to Prove Race Discrimination or Retaliation.** ..................................................................... 8

        A.    No reasonable jury could conclude Farmakis put Ms. Downing on a coaching plan or a PIP because of her race or in retaliation. ................................. 8

        B.    No reasonable jury could conclude Abbott realigned its sales territories because of Ms. Downing's race or in retaliation. .................................. 13

        C.    No reasonable jury could conclude Abbott's decisionmakers let Ms. Downing go in the RIF because of her race or in retaliation. ....................... 15

        D.    No reasonable jury could conclude that Ms. Downing was not promoted to a Director because of her race or in retaliation. ................................... 19

IV.  **Ms. Downing's Title VII Discrimination Claims Fail Because Abbott Would Have Taken the Allegedly Adverse Acts Even if Ms. Downing Were Not African American** ........................................................................................... 25

V.    **Ms. Downing Has Failed to Prove Damages Related to the Coaching Plan and Realignment Process.** ............................................................................... 27

Conclusion ..................................................................................................................... 28

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................2

*Arean v. Cent. Fla. Invs., Inc.*,
2012 WL 1191651 (M.D. Fla. Apr. 10, 2012)........................................23

*Boss v. Castro*,
816 F.3d 910 (7th Cir. 2016)....................................................................6

*Bruso v. United Airlines, Inc.*,
239 F.3d 848 (7th Cir. 2001) ................................................................3, 4

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................2

*Cole v. Illinois*,
562 F.3d 812 (7th Cir. 2009) ....................................................................6

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
140 S. Ct. 1009 (2020)..............................................................................8

*Dass v. Chicago Bd. of Educ.*,
675 F.3d 1060 (7th Cir. 2012) ..............................................................5, 6

*Florek v. Vill. of Mundelein, Ill.*,
649 F.3d 594 (7th Cir. 2011) ....................................................................2

*Hathaway v. New Dimension Ctr. for Cosm. Surgery*,
2006 WL 1594060 (N.D. Ill. June 6, 2006) ..........................................27

*Hebert v. Unum Grp.*,
2020 WL 7074706 (E.D. Tex. Sept. 11, 2020)......................................23

*Heft v. Moore*,
351 F.3d 278 (7th Cir. 2003) ....................................................................2

*Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*,
755 F.2d 599 (7th Cir. 1985) ..................................................................27

*Huminski v. Stop & Shop Supermarket Co. LLC*,
2019 WL 4804913 (D. Conn. Sept. 30, 2019)......................................23

*Hutchison v. Amateur Elec. Supply, Inc.*,
    42 F.3d 1037 (7th Cir. 1994) ................................................................27

*Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*,
    988 F.3d 948 (7th Cir. 2021) ..................................................................8

*Kolstad v. Am. Dental Ass'n*,
    527 U.S. 526 (1999) ................................................................................3

*Langenbach v. Wal-Mart Stores, Inc.*,
    761 F.3d 792 (7th Cir. 2014) ..................................................................6

*Lauth v. Covance, Inc.*,
    863 F.3d 708 (7th Cir. 2017) ..................................................................8

*Lucero v. Nettle Creek Sch. Corp.*,
    566 F.3d 720 (7th Cir. 2009) ..................................................................7

*Madlock v. WEC Energy Grp., Inc.*,
    885 F.3d 465 (7th Cir. 2018) ..................................................................5

*O'Neal v. City of Chicago*,
    392 F.3d 909 (7th Cir. 2004) ..................................................................5

*Ortiz v. Werner Enterprises, Inc.*,
    834 F.3d 760 (7th Cir. 2016) ..................................................................8

*Sinha v. Bradley Univ.*,
    995 F.3d 568 (7th Cir. 2021) ......................................................... *passim*

*Staub v. Proctor Hosp.*,
    562 U.S. 411 (2011) ...........................................................17, 18, 20, 25

*Stragapede v. City of Evanston*,
    125 F. Supp. 3d 818 (N.D. Ill. 2015) ...................................................27

*Thakkar v. Station Operators Inc.*,
    697 F. Supp. 2d 908 (N.D. Ill. 2010) ....................................................2

*Theidon v. Harvard Univ.*,
    948 F.3d 477 (1st Cir. 2020) ................................................................23

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ..........................................................................8, 25

*Vesey v. Envoy Air, Inc.*,
    999 F.3d 456 (7th Cir. 2021) ......................................................... *passim*

*Washington v. Ill. Dep't of Revenue*,
   420 F.3d 658 (7th Cir. 2005) ................................................................................5, 6

**Statutes**

42 U.S.C. § 1981a(b)(1).......................................................................................................2

**Rules**

Federal Rule of Civil Procedure 50(a) ...............................................................................1

Defendants Abbott Laboratories and Abbott Molecular Inc. (Abbott) respectfully move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). Ms. Downing alleges that Abbott discriminated on the basis of race and/or retaliated against her when it:

1.      Placed her on a coaching and performance improvement plan (PIP);

2.      Reallocated her territory and sales associates as part of an AMD-wide realignment in 2014;

3.      Terminated her employment in a reduction in force (RIF) along with 42 other employees; and

4.      Failed to hire her as a Regional Commercial Director.

Abbott is entitled to judgment as a matter of law on these claims. No reasonable jury could conclude that the coaching plan or realignment were materially adverse employment actions. And even if they were, no reasonable jury could find that *any* of these actions were made because of Ms. Downing's race or in retaliation for engaging in a protected activity. Ms. Downing's claims related to the coaching plan, PIP, and realignment separately fail for the independent reason that she has failed to prove any damages stemming from those actions. While she generally claims a reduction in stock options due to the PIP—and the PIP alone—she offered no evidence sufficient to prove damages with adequate specificity. Finally, Ms. Downing's request for punitive damages should be denied as a matter of law because there is no evidence that Abbott's managerial employees or officers acted with malice or reckless disregard for Ms. Downing's right not to be discriminated or retaliated against and Abbott established that it engages in good faith efforts to implement an antidiscrimination policy.

## LEGAL STANDARD

Judgment as a matter of law should be granted where, as here, a plaintiff has "been fully heard on an issue" and there is no "legally sufficient evidentiary basis" for a reasonable jury to find for the plaintiff. Fed. R. Civ. P. 50(a)(1). The standard for granting a directed verdict

"mirrors" the standard for granting summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation omitted). A plaintiff must "do more than argue that the jury might have disbelieved all of the defendant's witnesses. Rather, the plaintiff must offer substantial affirmative evidence to support her argument." *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 601 (7th Cir. 2011) (quoting *Heft v. Moore*, 351 F.3d 278, 284 (7th Cir. 2003)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (stating that "some evidence" supporting party bearing the burden of proof will not avoid a directed verdict). If the evidence, viewed "through the prism of the substantive evidentiary burden," points to "but one reasonable conclusion," the Court should grant judgment as a matter of law. *Id.* at 250, 254.

## ARGUMENT

### I. Ms. Downing's Claim for Punitive Damages Should Be Dismissed as a Matter of Law.

Abbott starts with Ms. Downing's claim for punitive damages because she has failed to carry her burden of proof at trial and thus is not entitled to a jury instruction on punitive damages. Ms. Downing seeks punitive damages under both Title VII and § 1981. To start, she cannot recover under both provisions because "these claims arise from the same series of operative facts." *Thakkar v. Station Operators Inc.*, 697 F. Supp. 2d 908, 928 (N.D. Ill. 2010) (granting summary judgment). Allowing Ms. Downing to "seek punitive damages under both provisions would potentially enable the very kind of double recovery that § 1981a(a)(1) seeks to avoid." *Id.*

And Ms. Downing has not, and cannot, meet the standard for recovering punitive damages at all. Punitive damages are available if Ms. Downing proves that Abbott engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). Ms. Downing not only needs to

prove Abbott acted with malice or recklessness, she must also prove that Abbott, through its managerial employees, "acted with knowledge that its actions may have violated federal law." *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001). To prove knowledge, a plaintiff must "demonstrate[e] that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws." *Id.* at 858. Importantly, punitive damages are improper when an employer "show[s] that it engaged in good faith efforts to implement an antidiscrimination policy." *Id.* (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 544-45 (1999)). For good reason: "An employer's good faith efforts to comply with the requirements of Title VII demonstrate that the employer itself did not act in reckless disregard of federally protected rights, thus making it inappropriate to punish the employer for its employees' contravention of its established policies." *Id.*

Ms. Downing has not produced sufficient evidence to allow a reasonable juror to conclude she is entitled to punitive damages. *First*, Ms. Downing has presented no evidence that would allow a reasonable jury to conclude Abbott, or its managerial employees, acted with malice or reckless disregard for Ms. Downing's rights. Her complaints center on four actions: (1) performance management, (2) the realignment, (3) the RIF, and (4) the Director hiring. None of those incidents demonstrates any malice or recklessness. As discussed below, Ms. Downing had serious performance issues before and after Farmakis arrived. *See infra* at 9-13. Both of her prior managers had concerns about her performance. DX 36 (Bridgman); DX 13 (Jowett). Farmakis first suggested a coaching plan in March 2013, just months after he started, given the ongoing concerns. DX 110. Any claim that Ms. Downing is entitled to punitive damages for the RIF and Director-hiring process is even more farfetched. All of the Regional Sales Managers were fired in the RIF. Tr. 860:19-21 (Longoria). The decision was based at the position—not

performance—level. And Abbott hired four Directors based on their qualifications, including one African American. Tr. 861:24-862:4 (Longoria). Neither the RIF nor the Director hiring had anything to do with Ms. Downing's race or retaliation for her discrimination complaints.

*Second*, punitive damages are improper because there is affirmative, unrefuted evidence that Abbott "engage[s] in good faith efforts to implement an antidiscrimination policy." *Bruso*, 239 F.3d at 857. Abbott has a Code of Conduct, which employees were required to sign every year. Tr. 2149:21-2150:2 (Jowett); Tr. 2094:25-2095:10 (Redmond); Tr. 1892:21-1893:5 (Chaitoff). By signing the Code, employees are "committing to abiding by it" and upholding the "strong commitment" to "integrity." Tr. 2095:11-15 (Redmond); Tr. 1892:21-1893:5 (Chaitoff). Abbott also has both an antidiscrimination policy and an antitretaliation policy. Tr. 2150:11-14 (Jowett); Tr. 2095:19-22 (Redmond); Tr. 1894:5-9 (Chaitoff). The policies were "[a]bsolutely foundational" to "Abbott and its culture" because "Abbott wants their employees and how we represent Abbott as a corporation to our customers to hold up all of those policies. It's critical to the long-term success of the company and the way that we manage the organization." Tr. 2150:15-23 (Jowett). These policies are implemented through monthly and quarterly training. Tr. 2095:23-2096:5 (Redmond).

Further, Abbott has both an Employee Relations and a Human Resources department. Tr. 580:4-7 (Longoria). Longoria testified extensively about the steps she and others in her department take to ensure discrimination claims are investigated. ER is staffed with specialists who investigate complaints. Tr. 581:24-582:2 (Longoria). If a complaint comes in, it is "assigned to either an employee relations specialist or senior specialist" who "would investigate that complaint." Tr. 1763:15-1764:1 (Plettinck). Those specialists have the ability to conduct interviews, review documents, and speak to managers no matter how high in the corporate ranks.

4

Tr. 582:2-9 (Longoria). Indeed, the facts of Ms. Downing's allegations in this case are illustrative. When she alleged that Kirk Mason discriminated against her in January 2013, Abbott investigated. Tr. 720:19-721:1 (Longoria). When she alleged that Farmakis discriminated against her in July 2013, Abbott investigated. Tr. 896:10-18 (Longoria) ("Q. And did you learn that it was a response to complaints about Mr. Farmakis? A. Yes."). ER conducted a climate survey, taking responses and feedback from all four Managers. Tr. 1771:9-17, 1774:21-1775:4, 1777:3-9 (Plettinck). It then consolidated the replies and discussed them with Bridgman (Farmakis's superior), and then Longoria and Bridgman discussed them with Farmakis and provided subsequent coaching and counseling. Tr. 898:1-899:2 (Longoria).

Given these facts, from Ms. Downing's own case, no reasonable jury could determine she is entitled to punitive damages, and Abbott is entitled to a directed verdict.

## II. There is No Evidence that the Coaching Plan and Territory Realignment Were Materially Adverse Acts.

All § 1981 and Title VII claims, both discrimination and retaliation, include a "materiality" component, meaning "that the employer's challenged action would have been material to a reasonable employee." *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (Title VII); *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 471-72 (7th Cir. 2018) (§ 1981); *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1068-69 (7th Cir. 2012) (same). "A materially adverse employment action is more than a mere inconvenience or an alteration of job responsibilities." *Dass*, 675 F.3d at 1069. Not "everything that makes an employee unhappy is an actionable adverse action." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). A materially adverse action must involve compensation (including benefits), promotion chances, or changes to working conditions that are "humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in the workplace environment." *Madlock*, 885 F.3d at 470

(citation omitted). "In the retaliation context, "[a]n employer's action is not material ... if it would not have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Washington*, 420 F.3d at 662. An action that "does not affect pay or promotion opportunities lacks this potential to dissuade and thus is not actionable." *Id.*

Neither the coaching plan nor the realignment process were material adverse actions. First, the Seventh Circuit has repeatedly held that "placement on a [coaching plan] ... is simply not materially adverse in the discrimination context." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016); *see also Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014) ("The first two of these actions—her performance review and the 2010 [coaching plan]—are not materially adverse."); *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) ("[T]he adoption of the improvement plan did not constitute an adverse action ... ."). And there is no evidence whatsoever that the coaching plan affected Ms. Downing's employment. She kept the same job with the same responsibilities and the same pay. The *only* change was the requirement that she work with Mr. Farmakis on ways to improve her performance. PX 318. That's it, and it's not enough. There is no evidence showing a change that involved her compensation or promotion opportunities. Nor was there a change to her working conditions that could plausibly be considered humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative to qualify it as an action that was materially adverse.

The realignment process was not a materially adverse employment action, either. Again, Ms. Downing kept the same job with the same responsibilities with the same pay. Her sales region and a few of her direct reports changed but neither of those alterations are material adverse actions. Indeed, the Seventh Circuit has been explicit: a reassignment is not a materially adverse action, even if a plaintiff opposed the change or was unhappy with the result. *Dass*, 675

F.3d at 1069-70 (granting summary judgment because reassignment from 7th to 3rd grade not materially adverse); *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 728-30 (7th Cir. 2009) (granting summary judgment because reassignment from 12th grade to 7th grade teacher not materially adverse).

And Ms. Downing's claim that she was placed in a less profitable region with inferior sales representatives is without factual basis. For her sole proof that the two African American Regional Sales Managers had the worst regions after the realignment, Ms. Downing points to a presentation prepared by ZS Associates, a third-party data analytics consulting firm, which lists the 20 territories by gross margin index. DX 194 at 13. Ms. Downing argues that the listing shows that the territories were ranked from best to worst, but her argument misses the point of gross margin index scores—they are not indicative of future performance or ability to hit sales goals. Instead, they show the workload of each region. Tr. 2249:15-17 (Cielocha). An index score that is too high could be just as detrimental to a territory's success as one that is too low. Even still, Regional Sales Managers were evaluated based on the percentage of their sales goal they achieved each year, and the sales goals were individually tailored based on their territories. Tr. 2211-2212 (Cielocha). Their bonuses, likewise, were also tied to the percentage of sales achieved. Tr. 2214-2215 (Cielocha). Ms. Downing's sales goal thus reflected her territory—just like every other Manager.

Based on these facts, no reasonable jury could conclude either the coaching plan or the realignment process were materially adverse employment actions. Thus, Abbott is entitled to judgment as a matter of law.

7

III.     **Downing Failed to Present Legally Sufficient Evidence to Prove Race Discrimination or Retaliation.**

To prove a claim of discrimination or retaliation, a plaintiff must present evidence that "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017).[1]  Ms. Downing claims that Abbott took four adverse actions:  (1) placed her on a coaching plan and a PIP, (2) realigned sales territories, (3) terminated her employment as part of a business-wide RIF, and (4) failed to hire her as a Director.  At this stage, what matters is "whether a plaintiff presented enough evidence to allow the jury to find in [her] favor."  *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (citation omitted).  Ms. Downing did not.

A.     **No reasonable jury could conclude Farmakis put Ms. Downing on a coaching plan or a PIP because of her race or in retaliation.**

No reasonable jury could conclude that Mr. Farmakis put Ms. Downing on a PIP because of her race or in retaliation for complaining about discrimination.  The record is filled with evidence that Ms. Downing's performance issues predated Farmakis's employment.

Both of Ms. Downing's managers preceding Farmakis identified and communicated serious performance concerns.  Ms. Downing highlighted Chris Jowett, her former manager at Abbott, as a critical figure in her case.  During opening arguments, Ms. Downing's counsel

---

[1] To prove her § 1981 race discrimination and Title VII retaliation claims, Ms. Downing must prove that the racial discrimination and retaliation were the but-for cause for the adverse action.  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (rejecting motivating factor test for § 1981 claims); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation.").  To prove her Title VII race discrimination claim, Ms. Downing must prove that racial discrimination was a motivating factor for the adverse action.  *Nassar*, 570 U.S. at 353. Ms. Downing cannot meet either standard and thus her claims fail as a matter of law.

argued that Ms. Downing's 2011 Exceeds Expectations review from Mr. Jowett proves any and all subsequent negative comments were a form of racist discrimination. Tr. 361:8-363:15 (Opening). But at trial, Jowett made clear Ms. Downing's performance was far from perfect. In 2010, Jowett had rated Ms. Downing as "Achieved Expectations" overall—including "Partially Achieved" on several categories like administration, business process, business knowledge, and environment and knowledge sharing. DX 13 at 2-3, 9, 10. Thus, although Jowett gave Ms. Downing an Achieved Expectations rating in 2010, "[i]t was probably on the lower end if you had a range for 'achieved expectations.'" Tr. 2136:2-3 (Jowett).

In 2011, Jowett did, as Ms. Downing repeatedly emphasizes, give her an Exceeded Expectations review. PX 36. She had improved "[i]n a number of the categories that previously [Jowett] had rated her as partially achieved" and her team nearly hit 100% of the sales goal, "which was [a] tremendous performance financially." Tr. 2140:14-21 (Jowett). But the business was changing rapidly. When the government reimbursement rate dropped precipitously, sales became harder. Tr. 2140:9-2141:7 (Jowett). The competitive "environment in the first quarter of 2012 just compounded the pressure on the entire division and every individual sales manager and the sales reps." Tr. 2144:14-24 (Jowett). Ms. Downing struggled to adapt and "was not really open to feedback"— "a consistent theme the entire time [Jowett] worked with [her]." Tr. 2144:25-2145:4 (Jowett). And despite Ms. Downing's reliance on Jowett, he knew her limitations. After Jowett left Abbott, he recruited Jean Gray and Charlotte Jones—former Abbott Molecular Regional Sales Managers—to his new company. Tr. 2159:12-2160:1 (Jowett). Jowett didn't call Ms. Downing because she "wasn't someone I probably felt could take on the complexity of the sales position, the sales management position I had at Qiagen." Tr. 2160:2-5 (Jowett).

9

All of this is relevant to Farmakis's decision to recommend putting Ms. Downing on a coaching and performance improvement plan. Jowett left Abbott Molecular after Q1 2012. When Farmakis took over, Jowett spoke with him about Ms. Downing and gave Farmakis his thoughts about Ms. Downing's performance to incorporate in her 2012 review. Tr. 2148:14-2149:5 (Jowett).

Mark Bridgman, who immediately succeeded Jowett and was ultimately Farmakis's manager, raised similar concerns. While Ms. Downing's direct manager, Bridgman rated the Regional Sales Managers across a range of key categories, as opposed to just sales numbers, and ranked Ms. Downing fourth of five Managers on September 2012—a month before Farmakis started at Abbott Molecular. DX 36. Bridgman, like Jowett, also provided Farmakis with feedback to use in Ms. Downing's 2012 review. *See* DX 124.

Ms. Downing's performance issues continued once Farmakis arrived. Farmakis raised concerns about Ms. Downing's performance in December 2012—just months after he was on the job. PX 1217; DX 99. Several significant events demanded that Ms. Downing be put on performance improvement measures:

***Viracor***. In September 2012, just weeks before Farmakis assumed his managerial responsibilities at Abbott Molecular, Ms. Downing agreed to write off a $177,000 debt for a customer that was over $1 million behind its purchase requirement and had decided to use a competitor's product. Tr. 1331:16-19, 1337:1-10 (Downing). Ms. Downing unilaterally agreed to write off the debt, Tr. 1350:2-15 (Downing), despite not having the authority to do so. DX 23 at 8; 533.083 at 2. Once Farmakis joined Abbott, he pressed Ms. Downing to explain "who authorized/approved [her] to tell Viracor that they do not need to pay" the $177,000. DX 73; Tr. 1342:12-25. The answer is no one. And Ms. Downing knew she didn't have the authority.

After the meeting with Viracor where she agreed to write off the debt, Viracor pressed Ms. Downing for a formal letter rescinding the demand. DX 60. Ms. Downing stalled, knowing she couldn't provide the letter. *Id.* She hadn't notified Farmakis or Bridgman of her decision, Tr. 1465:4-18 (Downing)—yet directed one of her sales representatives to tell Viracor that all of the key people had been notified about her decision and that a letter was forthcoming. DX 60; Tr. 1464:18-1465:18 (Downing). None of that was true: no letter was written or provided. DX 73; DX 81; DX 99.

*Withholding Care*. In another example of poor judgment and leadership, Ms. Downing withheld a "key" necessary to use Abbott's medical equipment during contract negotiations. DX 45. The m2000, the machine in question, is "important to caring for patients and really, in some circumstances, making sure that [patients] are sufficiently healthy to stay alive." Tr. 1471:2-6 (Downing). Without the key, the machine cannot run the diagnostic tests. Tr. 1471:7-10 (Downing). Yet Ms. Downing's team withheld the key in negotiations. DX. 45. The customer wrote, "if you cannot provide the key by next week, we will need to talk to the highest executive in the company you can get us in touch with" because it "is unacceptable that we'd be held hostage for this key because of a contract that could be resolved very quickly." *Id.* The customer then reached out directly to Mr. Farmakis, Tr. 1473:11-13 (Downing), who, unbelievably, had to tell Ms. Downing that she should "never disrupt patient care or withhold items that could disrupt patient care, even if we are in the heat of negotiations." DX 45; Tr. 1474:4-8 (Downing). This was just three weeks after Farmakis joined Abbott Molecular and became Ms. Downing's manager. Tr. 1474:9-11 (Downing).

*Training Slots*. Just six weeks after Farmakis became her manager, Ms. Downing gave away eight training slots to a customer during negotiations over a new contract. Tr. 1474:21-22

(Downing). While Ms. Downing claimed no one had ever questioned her about those training slots before Farmakis (suggesting he fabricated the issue in his plan to discriminate against her), the evidence proved that was wrong. Tr. 1475:8-12 (Downing). During negotiations, Abbott's training department reported that the customer "has attended PV training in the past and therefore has exhausted their two no-charge training slots." DX 63. The training department flagged that "there may have been communications with managers requesting an exception to this policy," but the information was not shared with the training department. *Id.* The head of Abbott's field service and training department insisted on setting a meeting to discuss Ms. Downing's promise of eight free training sessions and whether it could be accommodated. *Id.*; Tr. 1478:7-1479:1 (Downing). Farmakis then stepped in to support Ms. Downing and get the training department to approve and fulfill Ms. Downing's commitment. DX 65; Tr. 1480:8-21 (Downing) ("Q. Yeah. He's urging the training department to approve this by saying, 'We need to take care of this one,' right? A. Yes."). The training department ultimately relented, but made clear that "moving forward ... before any commitments are made, let's talk it over beforehand." DX 65; Tr. 1481:17-1482:5 (Downing).

Sarah Longoria, Abbott Molecular's Director of Business HR, wasn't surprised by Farmakis's concerns because she had heard similar concerns from Jowett and Bridgman and had had her "own direct interactions with Ms. Downing as well." Tr. 882:23-883:9. Several months later in March 2013, Farmakis first raised the idea of putting Ms. Downing on a coaching plan to help her improve. DX 110. Given this timeline—with concerns about Ms. Downing's performance (*after* all of the events discussed above) from both before and after Farmakis arrived and months before the climate survey in September 2013—no reasonable jury could

conclude Farmakis discriminated against Ms. Downing or retaliated against her by formalizing

the performance feedback in a coaching plan and, when she still failed to improve, in a PIP.

**B.      No reasonable jury could conclude Abbott realigned its sales territories because of Ms. Downing's race or in retaliation.**

No reasonable juror could conclude that Abbott realigned its sales territories because of

race discrimination or retaliation.  Ms. Downing presented no evidence—beyond conspiratorial

accusations unsupported by fact or logic—to support this new-found theory that was not pleaded

in her complaint or calculated in her damages.  Ms. Downing's theory is that, somehow,

Farmakis intentionally manipulated her sales region in order to give her worse territories and

sales representatives than she had prior to the realignment.  That belief, without more, is

insufficient to give this issue to the jury.  It also wholly ignores the history leading up to the 2014

realignment and fails to grasp what the realignment results actually did for Abbott Molecular.

As Steve Cielocha testified, Abbott worked with ZS Associates—a third-party data

consultant that specializes in territory realignments—in late 2012 to begin gathering data for an

upcoming realignment.  Tr. 2239:8-16 (Cielocha).  This was *before* Ms. Downing ever

complained to Employee Relations about Peter Farmakis, filed her EEOC charge, or participated

in the climate survey.  ZS Associates culled through tens of thousands of rows of data provided

by the Abbott Molecular sales team, including Ms. Downing, to come up with a proposal that

would balance the territories in order to maximize efficiency and profit for Abbott.  Tr. 2230:7-

18, 2234:15-2235:11 (Cielocha); DX 194.  This process, which took over a year to implement,

was methodical and data-driven.  Tr. 2245:5-2246:8 (Cielocha).  And most importantly, Plaintiff

has offered no proof that discrimination or retaliation played any role whatsoever in the final

territory alignments.

13

Ms. Downing contends the realignment was discriminatory because she received worse sales territories than she had previously and that she lost her best sales representatives while the African American sales representatives were consolidated under African American Regional Sales Managers. Nothing in the record supports this argument. There is no evidence that:

- ZS Associates harbored any racial animus towards Ms. Downing. To the contrary, ZS Associates—an outside consultant who specializes in this exact type of work— does not factor into account race at *all* when gathering, analyzing, or proposing information.

- The methodology of the realignment was unfair, let alone discriminatory. Ms. Downing cannot point to a single piece of evidence, either testimony or document, showing that she received a poor territory—much less that she received a poor territory because of her race. As noted above, Ms. Downing points solely to the regions' gross margin indexes, DX 194 at 13, to argue she and the other African American Manager received the worst territories, but her argument mistakes the index scores. They are not indicative of future performance or ability to hit sales goals, but only show the workload of each region. Tr. 2249:13-17 (Cielocha). And an index score that is too high could be just as detrimental to a territory's success as one that is too low.

- The realignment moved the African American sales representatives to African American Managers. In fact, none of the African American sales representatives were switched to new Managers as part of the realignment—nothing changed. *Compare* PX 586 (2014 Org Chart), *with* PX 587 (2013 Org Chart).

- Farmakis, Longoria, or any other decisionmaker at Abbott altered the proposal that ZS Associates provided in late November 2013. DX 194; Tr. 2242:20-2243:9 (Cielocha).

Ms. Downing's claim is based on the theory that Abbott set in motion a plan that would cost them a hundred thousand dollars and a year's worth of work—*before* Ms. Downing engaged in any protected activity—to give Ms. Downing a bad region. Not because Abbott wanted to maximize the efficiency of its territories, not to make money for its shareholders, but to discriminate against Ms. Downing. This is a conspiracy theory completely unhinged from the facts presented at trial. Put simply, it is a far cry from the "legally sufficient evidentiary basis" required under the law. This is not an issue that the jury should consider.

### C.    No reasonable jury could conclude Abbott's decisionmakers let Ms. Downing go in the RIF because of her race or in retaliation.

Ms. Downing next claims that she was let go in the RIF because of her race and in retaliation for complaining about discrimination.  No reasonable jury could reach that conclusion based on the evidence presented at trial.

***First***, there is no evidence of intentional discrimination.  The primary decisionmakers for the RIF were Chaitoff and Longoria, but as the court said at summary judgment, "Downing has not offered any evidence suggesting that [Chaitoff] acted with a discriminatory or retaliatory motive" and, "[a]s to Longoria, the evidence set forth by Downing is sparse." Dkt. 253 at 26.  That is even more true now, on the trial record.  The sole evidence on the RIF is Ms. Downing's say so.  And she concedes, as she must:

- Abbott Molecular's business was struggling, Tr. 1273:13-1274:16;

- Over 40 people were let go in the RIF, Tr. 1272:7-14;

- All four Regional Sales Managers were let go in the RIF, Tr. 1282:7-12; and

- She was offered a generous severance package, as was every other individual let go in the January 2015 RIF, Tr. 1282:13-15.

No reasonable jury could conclude any decisionmaker included Ms. Downing in the RIF because of her race or in retaliation for complaining about discrimination.  Chaitoff joined Abbott Molecular in mid-2014.  Tr. 1833:25-1834:5 (Chaitoff).  Abbott's business was "bad in that it wasn't meeting the expectations from senior management" and "sales were going down." Tr. 1843:19-23 (Chaitoff).  "It wasn't meeting expectations from senior management" and, "quantitatively," "sales were going down."  *Id.*; *see also* Tr. 937:16-18 (Longoria).  Government reimbursements were down and customers insisted on a lower price.  Tr. 1845:11-1847:13 (Chaitoff).  At the same time, there were "also some new competitors coming in which, again, just put price pressure as customers know they [have] got a cheaper alternative."  Tr. 1848:19-

1849:19 (Chaitoff). This put tremendous pressure on the business, and Abbott was forced to cut costs. Tr. 867:14-18 (Longoria). This included reducing the number of employees through a RIF. Tr. 1851:10-1852:7 (Chaitoff); *see also* Tr. 937:19-20 (Longoria).

Abbott "Molecular's then current, so pre-RIF approach, to sales and to strategy" was not working. Tr. 944:6-8 (Longoria). The RIF was a restructuring of the entire leadership structure in the Abbott Molecular sales department. Tr. 867:16-24 (Longoria) ("[W]e had to eliminate the national sales director and all the regional sales managers. So we left the U.S. organization with essentially no leadership ... ."). Abbott eliminated the Regional Sales Manager position entirely. Tr. 1856:15-21 ("The sales manager job went away. ... They were all eliminated."). All four then-current Managers were fired in the RIF—two black women, one white woman, and a white male—based on the position, not performance. Tr. 861:24-862:4 (Longoria); Tr. 1856:15-1857:2 (Chaitoff) ("It was completely organizational ... ."). Farmakis, Ms. Downing's performance, and Ms. Downing's performance improvement plain, had nothing to do with why she was let go in the RIF. Tr. 860:15-18 (Longoria). Rather, "[s]he was impacted in a restructuring along with all of her peers and also along with Mr. Farmakis." Tr. 860:19-21 (Longoria). The purpose was to "upgrade" the position and make it better while simultaneously cutting costs by eliminating an entire level of senior management. Tr. 1857:3-9 (Chaitoff). In total, about 40 people lost their jobs companywide, and Abbott save roughly $30 million through the restructuring alone. Tr. 1858:15-22 (Chaitoff).

That is not a sham; that is a RIF. There is no evidence of any intentional discrimination related to the RIF whatsoever. On that basis alone, the claim cannot survive.

***Second***, this claim cannot survive under a cat's paw theory, either. The cat's paw theory applies "when a biased supervisor, or a biased subordinate, who lacks decision-making power

uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) (citation omitted). "But the mere fact that an employee's wrongdoing was reported by a biased supervisor with a retaliatory or discriminatory motive does not establish liability under a cat's paw theory." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 462 (7th Cir. 2021). A plaintiff must prove that "the biased supervisor's actions were a proximate cause of the adverse employment action." *Id.* If, however, a decisionmaker's "adverse employment action did not rely on the credibility of a biased supervisor," the "cat's paw theory will fail for lack of proximate cause." *Id.* So long as "the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action ... the employer will not be liable." *Id.* (citation omitted); *Sinha*, 995 F.3d at 574 (same).

Thus, to prove a cat's paw claim, Ms. Downing must show that (i) Farmakis was motivated by discriminatory animus and intended to cause an adverse action and (ii) the RIF decisonmakers uncritically relied on Farmakis's views rather than having their own independent reasons to take those actions. *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

There is no evidence in the record that Farmakis was responsible for the RIF. The undisputed evidence proves precisely the opposite: Farmakis did not "trigger" or "intentionally cause" the RIF. The RIF was a result of Abbott's need to restructure, improve, and cut costs in the face of competitive pressure. The business plan for the RIF was approved by Chaitoff, Chaitoff's manager, Abbott's head of diagnostics, Abbott's head of HR, and Abbott's companywide CFO. Tr. 944:12-24 (Longoria); Tr. 1861:9-11 (Chaitoff). Farmakis wasn't involved at all: he didn't decide to implement the RIF and wasn't involved in its implementation, either. Tr. 1859:7-8 (Chaitoff). More to the point, Farmakis himself was let go

in the RIF.  Tr. 956:22-957:3 (Longoria).  Farmakis did not, despite Ms. Downing's theory in this case, embark on a "deliberate scheme" to "trigger" an event that resulted in his own firing. *See Sinha*, 995 F.3d 568, 574 (7th Cir. 2021).  He had no role in deciding which Manager positions would be terminated (all were) or in deciding who Abbott would hire to fill the new organizational structure, either.  Tr. 956:18-19 (Longoria); Tr. 1859:7-8 (Chaitoff) ("Was Mr. Farmakis involved in the RIF planning?  A. No.").

Nor is there any evidence that Chaitoff and Longoria—the decisionmakers—relied on Farmakis when deciding which positions to cut in the RIF.  It is not enough that Ms. Downing was put on a coaching and performance improvement plan.  Rather, Farmakis's alleged discrimination, and the performance management plan, must be the "proximate cause" of Chaitoff and Longoria's decision to eliminate the Manager positions, including Ms. Downing's. *See Staub*, 562 U.S. at 422.  And proximate cause does not exist where an independent "investigation results in an adverse action for reasons unrelated to the supervisor's original biased action." *Vesey*, 999 F.3d at 462 (quoting *Staub*, 562 U.S. at 420-21).

Chaitoff and Longoria—and their superiors—had independently sufficient reasons to eliminate the Manager positions in the RIF (leading to Ms. Downing's termination):  Abbott Molecular's business was struggling and needed to adapt.  The entire Manager position was "eliminated" to "upgrade" the position.  Tr. 1856:15-21 (Chaitoff).  As Longoria explained, the decision was at the position level and had nothing to do with performance—and all four managers were let go.  Tr. 861:24-862:4 (Longoria); Tr. 1856:15-1857:2 (Chaitoff) ("It was completely organizational ... .").  Under *Vesey* and *Sinha*, this defeats cat's paw liability. *Vesey*, 999 F.3d at 462 (stating that no cat's paw claim exists where "an employer's decision to take an adverse action did not rely on the credibility of a biased supervisor" but rather "the employer

18

believed it had independently sufficient reasons" to take adverse actions); *Sinha*, 995 F.3d at 575

(stating that no cat's paw claim exists where a challenged decision "depends on" other reasons).

> **D.      No reasonable jury could conclude that Ms. Downing was not promoted to a Director because of her race or in retaliation.**

The evidence presented during Ms. Downing's case uniformly establishes that Abbott's

hiring decisions were the product of reasoned analysis, not discrimination or retaliation.

***First***, there is no evidence the decisionmakers themselves discriminated.  The panel

included Longoria, Chaitoff, and David Skul—only Longoria testified in Ms. Downing's case.

And Longoria's testimony confirms the lack of evidence of any racial discrimination.  She

testified that the interview process was "structured," meaning the three were "aligned" on how

they were "going to assess the candidates" and "set the interview itself up in a consistent way."

Tr. 791:3-12.  Each interviewee had "the same information about what to expect" and then the

decisionmakers "used that criteria to assess the candidates across the board" consistently."  *Id.*;

*see also* DX 332; Tr. 919:16-920:25 (Longoria).

Chaitoff, who Abbott called in its case, made the same points.   Before interviews,

Chaitoff emailed each interviewee "background on the process ... and required preparation."  DX

331.  He outlined the interview process:  panel, time limits, location, and preparation.  *Id.*  Then,

Chaitoff explained the six criteria he expected to discuss at the meeting:  inspirational leadership,

financial goal success, process, integrity/teamwork, performance management, and breadth of

experience.  *Id.*  Every interviewee received this email and knew what to expect beforehand.  Tr.

1874:21-23 (Chaitoff).  And these were "the criteria that [Chaitoff] had selected and that

[Abbott] ... painstakingly tried to adhere to" and in fact "adhere[d] to."  Tr. 1876:13-18

(Chaitoff).  Chaitoff applied the criteria to a candidate's resume, interview, and the interviewees'

previous experience with an applicant.  Tr. 1877:20-1878:4 (Chaitoff).

19

The only evidence Ms. Downing presented related to the hiring process was a spreadsheet tracking the decisionmakers' interview notes. *See* PX 1131. But nothing in that document is evidence of discrimination. A plaintiff's mere disagreement with their interview rating is not enough to submit a race discrimination question to the jury. No reasonable jury could conclude the decisionmakers discriminated against Ms. Downing solely because they did not rate her as highly as other candidates Tr. 958:21-968:5 (Longoria); Tr. 1883:5-1886:3 (Chaitoff); DX 333; DX 334; DX 339; DX 349. Ms. Downing's only other argument appears to be that Abbott's decision to hire Eron Butler, an African American man, to fill one of the Director roles proves Abbott discriminated against her. That is illogical. Abbott's commitment to diversity cannot possibly be evidence that it discriminated against Ms. Downing. Diversity was important from the start of the director hiring process. Tr. 1879:10-12 (Chaitoff). And no reasonable juror could conclude that just because legal and HR were involved in a RIF and hiring process there was a companywide conspiracy to cover alleged discrimination. Tr. 1878:23-1879:9.

**Second**, Ms. Downing's claims related to the rehiring process fare no better under a cat's paw theory. She has presented no evidence that would allow a reasonable juror to conclude Farmakis intended to, and in fact triggered, the rehiring process or that the decisionmakers— Chaitoff and Longoria—uncritically relied on Farmakis's views rather than having their own independent reasons not to hire Ms. Downing. *Staub*, 562 U.S. at 422; *Sinha*, 995 F.3d at 574; *Vesey*, 999 F.3d at 462.

Ms. Downing presented no evidence that Farmakis triggered the Director-rehiring process. Nor could she. The timing of the RIF and Director-hiring decisions further confirm that Farmakis did not "trigger" these subsequent actions. The rehiring process followed logically, and quickly after the RIF. Tr. 1868:20-1869:3 (Chaitoff). Because the RIF—which Farmakis

20

did not trigger, either—eliminated all of the Manager positions and replaced them with a director-level position, Abbott had to interview candidates to fill the new roles. And they did. Farmakis played no role in that process. Indeed, he himself sought, but did not get, an interview. Tr. 1872:25-1873:2 (Chaitoff); Tr. 956:22-957:3 (Longoria).

Nor has Ms. Downing presented any evidence showing that the decisionmakers uncritically relied on Farmakis's views or his credibility when making their rehiring decisions. The rehiring decision was made by a three-person panel, led by Chaitoff, who selected higher qualified candidates with zero consideration of Farmakis's views, Tr. 789:24-25 (Longoria). Farmakis's year-old PIP decision is irrelevant and cannot support a cat's paw claim. There was a full year in between the 90-day PIP (which concluded in March 2014), DX 222, and the RIF and hiring decisions (which concluded in March 2015), Tr. 1868:24-1869:3 (Chaitoff).

And none of the decisionmakers—Longoria, Chaitoff, and Skul—relied on anything Farmakis said when making their decisions about who to hire for the new Director roles. Indeed, Farmakis did not "have a say in the director" hiring, Tr. 956:18-19 (Longoria), and the decision makers did not even "ask him for his opinion of any of the candidates," Tr. 956:20-21 (Longoria). There was no need. Longoria, Chaitoff, and Skul each had their own personal experiences with Ms. Downing and were familiar with her work at Abbott. Tr. 957:9-958:6 (Longoria).

For instance, although Longoria believed Farmakis's complaints about Ms. Downing's performance, she did so "because he wasn't the first person who came forward with performance concerns about Ms. Downing," Tr. 629:22-24 (Longoria), and thus had "independently sufficient reasons, such as corroboration of the allegations" about Ms. Downing's performance, *Vesey*, 999 F.3d at 462. Jowett, Ms. Downing's former manager, had "concerns about her performance" and

21

told Longoria that Ms. Downing "was struggling a bit in her first year" as Manager and had to be transferred to a new territory. Tr. 869:19-870:8, 883:2-6 (Longoria). Jowett himself testified extensively about Ms. Downing's issues as a Regional Sales Manager. Bridgman, Ms. Downing's next manager, rated Ms. Downing fourth of five Managers in a holistic review of each Manager across a range of areas. DX 36. And Iliana Pluta, Longoria's executive assistant, told Longoria that Ms. Downing had read a newspaper on a "ride-along" with one of her sales representatives—a time "for the manager and the employee to engage on what the employee has on his or her plate, for the manager to coach the employee, [and] go to customer meetings with the employee." Tr. 889:14-19, 890:23-891:7 (Longoria). Longoria thus had corroboration from Jowett, Bridgman, and Pluta—in addition to her "own direct interactions with Ms. Downing"— about Ms. Downing's performance and abilities as a Manager. Tr. 883:2-6.

Nothing in the record shows Chaitoff relied on Farmakis at all. There is no evidence that Chaitoff "depended on" the PIP (or Farmakis's opinion more generally) as the reason to include Ms. Downing—and all Managers—in the RIF or for his Director-hiring decisions. Quite the opposite. He had personally observed Ms. Downing's performance in the months leading up to the RIF. Tr. 1886:20-1887:2 (Chaitoff). While Chaitoff readily acknowledged Ms. Downing had her strengths, she also failed to consistently meet her sales goals and struggled to lead poor performers and foster teamwork among her reports. Tr. 1887:3-20 (Chaitoff). Chaitoff also heard about Ms. Downing's performance from others, including Skul, Kirk Mason, and Farmakis—"the three business leaders that interacted with her the most." Tr. 1887:21-1888:10 (Chaitoff). Chaitoff's independence alone is fatal to Plaintiff's cat's paw theory. Even if Plaintiff could show that Longoria's decisionmaking was impermissibly "tainted" by Farmakis (and she cannot), there is no dispute that Chaitoff's input was integral to Director-hiring

decisions. He was the leader of that business unit and would "have [had] the final call because he [was] going to be responsible for the results." Tr. 956:11-15 (Longoria). This, by itself, dooms any cat's paw claim—at an absolute minimum each of these challenged decisions also "depended on" Chaitoff's perspectives as the leader of the business unit.

The same is true of Dave Skul, who also sat on the Director interview panel in an advisory role. Tr. 781:24-782:3 (Longoria) (noting she and Chaitoff "were the primary decision-makers"). Ms. Downing didn't call or present any evidence related to Skul, the third interviewer. And what evidence was presented proved that Skul "had a lot of interaction with Ms. Downing in that role" and thus would have had no need to rely on Farmakis's opinion. Tr. 958:4-6 (Longoria); *see also* Tr. 1888:7-10 (Chaitoff) (identifying Skul as one of "three business leaders that interacted with [Ms. Downing] the most").

*Vesey* establishes that where—as here—there is "corroboration of the allegations" first raised by a potentially-biased employee, cat's paw liability is defeated. 999 F.3d at 462. Other Courts outside of the Seventh Circuit are in accord. *See Hebert v. Unum Grp.*, 2020 WL 7074706, at *21 (E.D. Tex. Sept. 11, 2020) (corroborating a complaint "preclude[s] finding that a putative cat's paw exerted influence over the final decision maker"); *Huminski v. Stop & Shop Supermarket Co. LLC,* 2019 WL 4804913, at *4 (D. Conn. Sept. 30, 2019) (same); *Arean v. Cent. Fla. Invs., Inc.*, 2012 WL 1191651, at *7 (M.D. Fla. Apr. 10, 2012) (same). Thus, under *Vesey* and the authority above, when a biased subordinate was but "one of many voices in a chorus" that a decisionmaker considered, the stringent causation standard applicable to a cat's paw theory cannot be met. *See Vesey*, 999 F.3d at 462; *accord Theidon v. Harvard Univ.*, 948 F.3d 477, 508 (1st Cir. 2020) (holding no cat's paw where the allegedly biased supervisor was "one of many voices in a chorus").

23

Instead of discrimination or retaliation, the undisputed evidence demonstrates that Chaitoff, Longoria, and Skul evaluated Ms. Downing and the other candidates based on their resumes, presentation style, and interviews, along with six job-related criteria. Tr. 1883:5-1886:3 (Chaitoff); Tr. 957:4-8, 958:21-968:5 (Longoria); DX 332; DX 333; DX 334; DX 339; DX 349. Based on the candidate interviews, the panel concluded that the four selected candidates were the best fit for a higher-paying, higher-level job with more responsibility: Jim Menges, Julee MacGibbon, Pam Redmond, and Eron Butler. *Id.* Ms. Downing, despite her years of experience at Abbott, did not have the same key qualifications those individuals had:

Q. Now, Ms. Downing, did Ms. Downing have an MBA?

A. No.

Q. Had she been a director or a vice president for nationwide sales?

A. No.

Q. Had she been a manager for the key accounts we've discussed?

A. Not that I'm aware of.

Q. Had she worked in marketing or finance?

A. No.

Q. Had she worked for Abbott's main competitor?

A. No.

Q. Had she been successful in another Abbott division?

A. No.

Q. Had she been responsible for $70 or $100 million in sales?

A. No.

Q. Had she been responsible for managing 60 or 80 people?

A. No.

Tr. 967:10-968:2 (Longoria). It simply would not have made "business sense to hire Ms. Downing over these candidates" with these qualifications. Tr. 968:3-5 (Longoria).

That the decision regarding who to hire was made by a panel of decisionmakers based on a variety of factors breaks the causal chain under *Vesey* and *Sinha*. This is especially true because there is no evidence that Farmakis's opinion of Ms. Downing was discussed during the witness interviews. Nor is it mentioned in the decisionmakers' contemporaneously created Excel chart. PX 1131. But even if it were, at most it would be a "factor," not the "motivating" one, and certainly not the proximate cause of Abbott's decision not to hire Ms. Downing as a director. *Staub*, 562 U.S. at 419; *Sinha*, 995 F.3d at 575.

## IV. Ms. Downing's Title VII Discrimination Claims Fail Because Abbott Would Have Taken the Allegedly Adverse Acts Even if Ms. Downing Were Not African American.

Ms. Downing's Title VII discrimination claim fails for all of the reasons discussed above: she has not proved that her race was a motivating factor in Abbott's decision to performance manager her, realign territories, conduct a RIF, or not to rehire and promote Ms. Downing for a Director role. But her claim fails for an additional reason: Abbott has proven that it would have taken each of the allegedly discriminatory acts even if Ms. Downing were not African American. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013) ("If the plaintiff made that showing, the burden of persuasion would shift to the employer, which could escape liability if it could prove that it would have taken the same employment action in the absence of all discriminatory animus.").

*First*, Abbott proved that Ms. Downing suffered from serious performance issues. Ms. Downing's performance issues were well documented before she was put on the coaching plan and the performance improvement plan. Farmakis—and both of her prior superiors—had

raised concerns with her performance before she was placed on a performance management program. DX 13; DX 36; DX 110. No reasonable jury could consider that evidence—including writing off a $177,000 debt without approval and withholding a key necessary to provide patient care—and conclude her race had anything to do with Abbott's decision to put her on a performance plan. *See* DX 60; DX 80; DX 45. At a minimum, no reasonable jury could conclude that Abbott would not have put Ms. Downing on a performance plan had she not been African American.

*Second*, Abbott proved that the realignment process had nothing to do with Ms. Downing's race. ZS Associates, a third-party consultant ran the realignment process and implemented a data-driven process to create balanced and fair territories. Tr. 2250:9-14 (Cielocha). And, importantly, Abbott started the process before Ms. Downing's allegations of discrimination and retaliation. *Id.* No reasonable jury could conclude that Abbott would not have realigned sales territories if Ms. Downing were not African American.

*Third*, the evidence presented at trial conclusively established that Abbott conducted the January 2015 RIF because its business was struggling. Rough Tr. 111:10-14 (Chaitoff). Abbott needed to cut costs and improve its corporate structure to compete in an evolving—and increasingly difficult—competitive environment. Tr. 867:14-24, 937:19-20, 944:6-8 (Longoria); Rough Tr. 116:8-117:8, 118:24-119:21 (Chaitoff). Ms. Downing's race had nothing to do with it. Nor is there any dispute that the Regional Sales Manager position was eliminated entirely. Rough Tr. 124:2-8 (Chaitoff). All of the Regional Sales Managers lost their jobs—the cut was at the position level and had nothing to do with performance. Tr. 861:24-862:4 (Longoria); Rough Tr. 123:25-124:4 (Chaitoff).

26

*Fourth*, Abbott ran a structured interview process designed to find the most qualified individuals to serve as Regional Commercial Directors. Tr. 791:3-12 (Longoria). Ms. Downing got an interview. But she was not as qualified as the four people Abbott ultimately hired as Directors. Tr. 958:21-968:5 (Longoria); Rough Tr. 150:12-153:6 (Chaitoff); DX 333; DX 334; DX 339; DX 349. Her race had nothing to do with the hiring decision. It simply would not have made "business sense to hire Ms. Downing over these candidates" with these qualifications. Tr. 968:3-5 (Longoria). Abbott has proved that it would not have hired her even if she wasn't African American. No reasonable jury could conclude otherwise.

## V.    Ms. Downing Has Failed to Prove Damages Related to the Coaching Plan and Realignment Process.

Ms. Downing bears the burden of proving damages tied to the alleged adverse employment actions. *Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 606 (7th Cir. 1985) ("[P]laintiff has the burden of proving the damages caused her."). This includes both the fact and amount of damages. *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994) (noting plaintiff bears the burden of "establish[ing] the amount of damages she claims resulted from her employer's conduct"); *see also Stragapede v. City of Evanston*, 125 F. Supp. 3d 818, 823 (N.D. Ill. 2015) (stating a plaintiff "must establish the amount of damages"); *Hathaway v. New Dimension Ctr. for Cosm. Surgery*, 2006 WL 1594060, at *2 (N.D. Ill. June 6, 2006) ("In determining the proper award of back pay, a court must make sure that any award is not speculative ... ."). Indeed, as the proposed jury instructions make clear, "[i]t is Ms. Downing's burden to prove that she lost wage benefits and their amount." (Backpay).

Here, Ms. Downing has presented no evidence to establish any damages related to (i) the coaching plan, (ii) the PIP, or (iii) the realignment process. Tr. 1694:9-19 (Madden). Dr.

Madden, Ms. Downing's damages expert, analyzed only Ms. Downing's lost wages (backpay and frontpay). Ms. Downing did not lose her job (and subsequently not get hired as a Regional Commercial Director) because of the coaching plan, PIP, or realignment. There was limited testimony at trial that showed Ms. Downing's received fewer stock options and a lower bonus as a result of being put on a performance improvement plan. Tr. 853:20-24, (Longoria); PX 858. Even if true, it is of no use to her here. Ms. Downing presented no evidence that would allow the court to quantify her damages, if any. She has thus failed to carry her burden of proving damages with reasonable specificity. And Dr. Madden did not conduct an independent analysis of those purported adverse actions or attempt to quantify any harm related to them:

> Q. And so you also have not offered an opinion on damages with respect to sales territory realignment, right?
>
> A. No, I have not. I have not offered such an opinion.
>
> Q. You have no opinion on damages tied to Ms. Downing being placed on a coaching plan, is that correct?
>
> A. I have not computed damages for that, no.
>
> Q. And you have not offered any opinion whatsoever on damages tied to Ms. Downing being placed on a performance improvement plan, is that right?
>
> A. I have not, I have not estimated damages. I've only estimated damages from termination.

Tr. 1694:9-19. Thus, Ms. Downing has failed to carry her burden of proving damages and Abbott is entitled to judgment as a matter of law.

## CONCLUSION

For all of these reasons, Abbott respectfully requests that the Court grant directed verdict on Ms. Downing's discrimination and retaliation claims and request for punitive damages.

Dated: August 22, 2021                Respectfully submitted,

/s/ Christa C. Cottrell
_____

James F. Hurst
Christa C. Cottrell
Rebecca Fitzpatrick
Taj Clayton
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000
james.hurst@kirkland.com
ccottrell@kirkland.com
rebecca.fitzpatrick@kirkland.com
taj.clayton@kirkland.com

*Counsel for Abbott Laboratories and Abbott Molecular Inc.*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on August 22, 2021, I caused a copy of the Notice of Filing attaching **Defendants' Motion For Judgment As A Matter Of Law And Memorandum In Support** to be served via the Court's ECF system upon the following:

Linda D. Friedman
Suzanne Bish
George Robot
Shona B. Glink
Jared Calvert
Daniel B. Lewin
STOWELL & FRIEDMAN, LTD.
303 W. Madison St., Suite 2600
Chicago, Illinois 60606

Matthew Singer
Matt Singer Law, LLC
77 W. Wacker Dr., Suite 4500
Chicago, Illinois 60601

*Attorneys for Plaintiff Jacinta Downing*

Respectfully submitted,

*/s/ Christa C. Cottrell*
Christa C. Cottrell